McCarthy, Appellant, *v.* The Cincinnati Enquirer, Inc., Appellee.*

(No. 8022—Decided May 7, 1956.)

*Mr. Edward A. Doering* and *Mr. J. Glenn Williams,* for appellant.

*Messrs. Frost & Jacobs, Mr. James G. Headley* and *Mr. Francis L. Dale,* for appellee.

Hildebrant, J. This is an appeal on questions of law.

Plaintiff, appellant herein, seeks damages for defamation predicated upon the following editorial, entitled, "Fluoridation: The Facts," together with a paragraph on the same page headed, "The Voice of the Enquirer.":

"In the last few days we have had a depressing demonstration of how much harm one news broadcaster can do in a community. We refer to the daily efforts of Tom McCarthy of WKRC to create distrust of our public health authorities by misrepresenting the effects of fluoridation of our water supply, scheduled to begin on Sunday.

---

*Motion to certify the record overruled, October 10, 1956,

"By misleading statements, delivered in highly dramatic style, Mr. McCarthy has aroused widespread fears that fluoridation will raise the total death rate, cause more cancer and augment tooth decay. This is by no means the first time Mr. McCarthy has set himself against the community's welfare, thus drawing momentary attention to himself. But it is perhaps the least savory of his adventures.

"For those people who form their day-to-day picture of the world from Mr. McCarthy's dramatization of the news, we submit the facts regarding water fluoridation.

"In 1951 Cincinnati City Council authorized fluoridation by the addition of one part of fluoride in a million parts of water. This is to reduce tooth decay in children. The procedure has the unqualified endorsement of the American Medical Association, the American Dental Association, the U. S. Public Health Service and the American Water Works Association.

"Even with this confirmation, a thorough investigation was made by the Kettering Laboratory before Cincinnati took action. Local public health authorities and medical and dental groups have given their approval.

"Currently, about 10 million people in 600 communities in this country are drinking fluoridized water, including the District of Columbia, where Congress approved fluoridation. Fluoridation is accepted by most medical authorities just as vaccination is accepted, and as the chlorination of water supplies is accepted.

"The value of minute quantities of fluoride has been established in two ways—by the epidemiological studies of the U. S. Public Health Service, and by carefully controlled experiments in various communities, notably in New York State. The epidemiologists have plotted the incidence of tooth decay in areas of high fluoride content in the water, and in areas of very low fluoride content.

"These studies show that too much fluoride is bad for the teeth, and none at all is bad. They show that one part in one million does no harm and in the case of children especially does some good in arresting decay.

"Controlled experiments in New York communities, some with fluoridation and some without, give the same finding. This

gives positive evidence over quite some years that fluoridation is beneficial and not harmful. In adopting fluoridation, Cincinnati is not experimenting. It is making use of firmly established scientific data, to improve the health of its people. There is no sound evidence that proper fluoridation has any effect on cancer or death rate.

"THESE ARE THE FACTS, for those who want the facts. The same facts were available to Mr. McCarthy. But for reasons quite his own, he prefers not to limit himself to facts. In this case, he has done great harm by causing needless fears and by inciting distrust of fully qualified health officials. We are certain that most persons in Cincinnati will take the word of local and national medical authorities against the word of a broadcaster whose record of reliability we will let speak for itself. The pity is that Mr. McCarthy is permitted by Station WKRC to continue in a pattern of 'news reporting' that victimizes the gullible listener."

"THE VOICE OF THE ENQUIRER.

"When the water dispute is washed away, we wouldn't be surprised to see a Tom McCarthy bottled water appear on the market."

The petition does not set forth the complete publication, but selects the following excerpts as defamatory, and, no special damages being pleaded, plaintiff obviously considers the publication libelous per se, and so states in argument and brief:

"In the last few days we have had a depressing demonstration of how much harm one news broadcaster can do in a community. We refer to the daily efforts of Tom McCarthy of WKRC to create distrust of our public health authorities by misrepresenting the effects of fluoridation of our water supply, scheduled to begin on Sunday.

"By misleading statements, delivered in highly dramatic style, Mr. McCarthy has aroused widespread fears that fluoridation will raise the total death rate, cause more cancer and augment tooth decay. This is by no means the first time Mr. McCarthy has set himself against the community's welfare, thus drawing momentary attention to himself. But it is perhaps the least savory of his adventures.

"For those people who form their day-to-day picture of the world from Mr. McCarthy's dramatization of the news, we submit the facts regarding water fluoridation."

"THESE ARE THE FACTS, for those who want the facts. The same facts were available to Mr. McCarthy. But for reasons quite his own, he prefers not to limit himself to facts. In this case he has done great harm, by causing needless fears and by inciting distrust of fully qualified health officials. We are certain that most persons in Cincinnati will take the word of local and national medical authorities against the word of a broadcaster whose record of reliability we will let speak for itself. The pity is that Mr. McCarthy is permitted by Station WKRC to continue in a pattern of 'news reporting' that victimizes the gullible listener."

"THE VOICE OF THE ENQUIRER:

"When the water dispute is washed away, we wouldn't be surprised to see a Tom McCarthy bottled water appear on the market."

Following the overruling of defendant's motion for judgment on the pleadings, the case was tried to a jury upon the petition, amended answer thereto and reply, and resulted in a jury verdict for the defendant.

In the first four assignments of error, appellant claims the trial court abused its discretion in permitting the filing of the amended answer and later refusing to strike the same; in refusing to require production of a subpoenaed document; and in unduly restricting examination of an allegedly hostile witness, as well as indulging indiscreet comment during trial, tantamount to instructions to the jury out of procedural order; the cumulative effect of which denied appellant a fair trial.

Upon a careful examination of the record, the court finds no abuse of discretion, or lack of fair trial in the matters complained of, and no error therein prejudicial to appellant.

In 53 Corpus Juris Secundum, 34, Section 1, it is stated:

"b. Nature and Elements of Defamation.

"In order to create liability for defamation, there must be an unprivileged publication of false and defamatory matter about another which is actionable per se, or is the legal cause

of special harm to the other. Liability is determined by the law of the jurisdiction in which publication is made.''

To entitle plaintiff to recover, the language complained of, the words used, must be actionable in themselves.

It is stated in 25 Ohio Jurisprudence, 162, Section 5:

''Words may be actionable in themselves,—per se,—or they may be actionable only on allegation and proof of special damage—per quod. The distinction is based on a rule of evidence. Words of both classes are actionable on the same grounds and for the same reasons. The difference between them is in the matter of proof of the resulting injury. In the case of words actionable per se, their injurious character is a fact of common notoriety. They necessarily import damage, and therefore, in such cases, general damages need not be pleaded or proved, but are conclusively presumed to result, and therefore no special damage need be shown to sustain the action. Words actionable only per quod are those whose injurious effect must be established by due allegation and proof.''

With reference to rules of construction, it is stated in 25 Ohio Jurisprudence, 189, Section 40:

''* * * In determining whether the words spoken are actionable per se, they are to be taken in the sense in which they would naturally be understood by those who heard them. In arriving at the sense in which defamatory language is employed, it is proper and necessary to consider the circumstances surrounding its publication. In many instances words which are harmless in themselves may be actionable in the light of the surrounding circumstances. On the other hand, words which are apparently actionable in themselves, may be rendered not actionable by the surrounding circumstances.

''Whether an article is libelous or not, is not to be determined from segregated parts thereof, but from the entire article, keeping in mind the theme of the composition, the circumstances, and the occasion.''

Referring to the Ohio rule, as to the requirements necessary for printed and published words to be actionable without proof of special damages, the text in 25 Ohio Jurisprudence, 161, Section 4, in part, is:

"While this difference between slander and libel is recognized in Ohio, it seems to be settled by the great weight of authority that, even if printed and published, mere words of ridicule, which tend to lessen a man in public esteem, or to wound his feelings, are not always actionable without proof of special damages. The cases in Ohio in which the rule has been referred to were cases where the publication charged the plaintiff with a serious violation of moral law, although not with a technical violation of the criminal law, so that when the authorities are carefully considered in the light of a sound public policy, it appears that to come within the rule permitting recovery, without proof of special damages, the printed words of ridicule or contempt, must relate to matters which are required, either by the moral code or by the law of the land, liberally and not technically construed; printed words of ridicule or contempt which relate solely to political views or arguments on questions of public interest, and which do not attack the character of a person, and which do not impute immorality or a violation of the law, come within the rule applicable to spoken words, and are not actionable without proof of special damage."

The rule was applied in *Holloway* v. *Scripps Publishing Co.*, 11 Ohio App., 226, where it is held in the syllabus:

"Printed words of ridicule or contempt, which relate solely to political views or arguments on questions of public interest, and which do not attack the character of a person and do not impute immorality or a violation of law, but merely tend to lessen a man in public esteem or to wound his feelings, are not actionable without proof of special damages."

The basic concept seems to be that it is not libelous to charge a man with doing that which he may lawfully do and which is not a violation of the moral code.

In *Sweeney* v. *Beacon Journal Publishing Co.*, 66 Ohio App., 475, 35 N. E. (2d), 471, it is held:

"1. A publication which is claimed to be libelous *per se,* because it charges a person with utterances which bring him into ridicule, hatred or contempt, is not actionable without alleging special damages, unless such publication liberally and not technically construed charges utterances which are a violation of the laws of the land or of good morals.

"2. Printed words of ridicule or contempt, which relate solely to political views, or arguments on questions of public interest, which do not attack the character of a person, or impute to him immorality or a violation of the law, but which tend merely to lessen a man in public esteem, or to wound his feelings, are not actionable without alleging special damages."

In *Mauk* v. *Brundage,* 68 Ohio St., 89, 67 N. E., 152, 62 L. R. A., 477, it is held in paragraph two of the syllabus:

"In an action for libel the question whether the publication is or not libelous *per se* is a question for the court. And where the publication is claimed to be privileged the question whether or not the occasion gives the privilege, the controlling facts being conceded, is also for the court."

In *Cleveland Leader Printing Co.* v. *Nethersole,* 84 Ohio St., 118, 95 N. E., 735, Ann. Cas., 1912B, 978, the court held in the fourth paragraph of the syllabus:

"In an action to recover for an alleged libel the question whether the publication is or not libelous *per se* is a question for the court. (*Mauk* v. *Brundage,* 68 Ohio St., 89.) And where the publication is, as matter of law, not libelous *per se,* and no evidence has been given tending to show special damage, it is the duty of the court to sustain a motion by defendant, made at the close of the evidence, to direct the jury to return a verdict for defendant."

The principles declared in the cases cited above have been approved and followed and commented upon in the majority opinion and in the dissenting opinions in the more recent case of *Westropp* v. *E. W. Scripps Co.,* 148 Ohio St., 365, 74 N. E. (2d), 340, which is distinguishable from the case at bar in that the publication clearly contained a false statement of fact.

The pertinent circumstances under which the publication was made are that for a period of approximately two and a half years, the Council of the City of Cincinnati had been considering the desirability of fluoridation of the municipal water supply and had sought and received the study and advice of various qualified agencies and persons such as the Public Health Federation, Cincinnati Board of Health, Cincinnati Dental Society, Kettering Laboratory, Cincinnati Academy of Medicine, state Health Commission, City Commission on Public Health and the

Public Utilities Commission of Council, assigned to the task by council itself. This study or investigation culminated in an extensive report to the board of health by its vice chairman, denominated "Cincinnati Report, Fluoridation of Water Supply in the Prophylaxis of Dental Caries," following which the city council approved fluoridation, and it was to begin March 1, 1953.

Plaintiff states in his petition that at all times herein he was employed to broadcast news and comment thereon by Radio Cincinnati, Inc., over Station WKRC, and that a large and substantial number of persons in southern Ohio have become accustomed to listening to his broadcasts.

It is apparent at once that by the very nature of his employment plaintiff assumes a dual role of private citizen and public figure, so that, while not an elected public official, his position is one tantamount to that, and his broadcasts tantamount to a production or performance for public exhibition, thereby submitting them to fair and reasonable criticism within the class of privileged communications. 25 Ohio Jurisprudence, 220, Section 77.

Plaintiff's daily broadcasting schedule started with an early morning farm show and included broadcasts at 11 a. m., 12 noon, 5 p. m. and 6 p. m.

Between February 17, 1953, and February 25, 1953, inclusive, plaintiff devoted practically his entire broadcasting time, and to the exclusion of commercials, in opposition to fluoridation of the municipal water supply. He appeared before council and stirred that body to further study of the question. From a transcript of those broadcasts attached to and made a part of the record, we note that plaintiff undertook what amounted to a one man crusade in opposition to fluoridation, calling it his campaign against it; he referred to the public as guinea pigs in a mass medicaton on an experimental basis; he urged people to call their councilmen in opposition, stating he had appeared before council to give information in opposition, and quoting one councilman as stating that if any risk to public health was involved he would not approve fluoridation; he suggested the experiment in other municipalities had a relation to increases in the death rate from heart disease, kidney disorders, such as

nephritis, and the prevalence of cancer; he used the words toxic and poison in referring to fluorides; he charged the council's sources of advice, in being proponents of fluoridation, were biased and partially, at least, dependent on subsidization by industry having a by-product of fluorides to dispose of; he characterized some of their reports as being as phony as a "three dollar bill"; he charged all three Cincinnati daily newspapers with lack of research and care in endorsing fluoridation editorially, suggesting they yielded to pressure from proponents of fluoridation, and accused them of failing to give both sides of the question consideration; he charged the proponents with misstating facts and misleading the public, identical phraseology with some to which he takes exception in his petition; he concluded by stating that a million people would drink water containing toxic poison and that it was his business as a newsman to give the facts, and quoting one of council's chief advisers as stating fluoridation to be a calculated risk and that the three newspapers had no right not to print the other side.

His broadcasts over this period of time received usual notice and publicity in all three newspapers.

Plaintiff's campaign was successful, for thereafter the question of fluoridation was put to a vote of the people and rejected at the polls.

The record revealed all the circumstances set forth above at the close of all the evidence, and, at the time, the duty devolved upon the court to determine whether the publication considered in its entirety was libelous per se.

The court charged the jury that the publication was libelous per se. In the light of the Ohio law cited, *supra,* let us examine the material set forth in the petition as libelous in connection with the entire publication, keeping in mind the theme of the same, the entire circumstance and that the occasion was one of controversy on a public question perhaps vitally affecting the public health.

Construing the first paragraph, the first sentence appears to be merely an expression of defendant's own opinion and feeling of depression. The word, "harm," has reference to the cause of fluoridation, upon which subject the parties held diametrically opposite opinions, and in no sense can be construed

as actionable, illegal, unmoral harm. Certainly, that sentence should not be construed as libelous without pleading and proof of special damage. In the second sentence, charging daily efforts to create distrust of public health authorities is charging only what plaintiff had a lawful right to do, obviously sincerely thought was a public service to do, and from the results of the popular poll succeeded in doing. The word, "misrepresenting," standing alone and as used in the sentence is ambiguous, hence, cannot be construed as libelous per se and is subject to an innocuous connotation equally with any contra connotation in the absence of the pleading of any innuendo.

In the second paragraph, plaintiff is charged with arousing widespread fears of the effects of fluoridation by misleading statements on the subject. Again, this is a matter of defendant's opinion, and it is difficult to see that any pecuniary damage or social ostracism could accrue to plaintiff as a result thereof. The phrase, "misleading statements," as used is ambiguous and could be innocently or willfully made. Again, an innuendo would seem to be necessary upon which to base a claim of libel, so that without the pleading and proof of special damage nothing in that sentence should be construed as libelous per se. The second sentence is merely the critical opinion of the defendant, which charges nothing unlawful or unmoral and, hence, under Ohio law, not libelous per se.

The last paragraph is for the most part repetitious, so that what has already been said is applicable thereto. It is argued that the last sentence is a suggestion to the employer that plaintiff be discharged. We do not so construe it. Rather, it is a suggestion that the employer change the pattern of broadcasts, over which it has the control, and specifically to conform to defendant's views on the public question of fluoridation. Certainly, pleading and proof of special damage would be a necessary predicate to a cause of action in defamation, based on the above sentence.

As to the "Voice of the Enquirer" comment, it appears as an attempt to inject a note of the facetious into the controversy, and was, no doubt, suggested by the plaintiff's own comment in one of his broadcasts that the bottled water business in Cincinnati, in event of fluoridation, would take on a new lease on life.

In order to construe it as libelous, one would be required to suppose that plaintiff opposed fluoridation in the hope that it would be effected, in which event he would enter the bottled water business. Such a strained and unnatural construction exceeds the bounds of reason. We see nothing remotely libelous therein.

The entire voluminous record herein contains no proof of any damage accruing to plaintiff as a result of the publication complained of, but rather is a negation thereof. Without considering the ruling of the court on the motion for judgment on the pleadings, but taking the case at the conclusion of all the evidence and construing the publication in its entirety, keeping in mind the theme of it, the circumstances and the occasion of the debate in the public forum upon a question of vital importance to the public health, we conclude that the trial court was in error in charging that the editorial and the Voice of the Enquirer article were libelous per se, and should have granted defendant's motion for judgment at the close of all the evidence. Any error thereafter in submitting the case to the jury could not be prejudicial to the appellant and the court so finds.

We cite with approval as dispositive of this case, *Holloway* v. *Scripps Publishing Co., supra* (11 Ohio App., 226), and the case of *Cleveland Leader Printing Co.* v. *Nethersole, supra* (84 Ohio St., 118). Paragraph four of the syllabus in the *Nethersole case,* quoted, *supra,* is:

"In an action to recover for an alleged libel the question whether the publication is or not libelous *per se* is a question for the court. (*Mauk* v. *Brundage,* 68 Ohio St., 89.) And where the publication is, as matter of law, not libelous *per se,* and no evidence has been given tending to show special damage, it is the duty of the court to sustain a motion by defendant, made at the close of the evidence, to direct the jury to return a verdict for defendant."

In view of the foregoing, the final judgment entered for defendant in the court below is, hereby, affirmed.

*Judgment affirmed.*

Matthews, J., concurs.

308

Ross, P. J., dissenting. Before entering into consideration of the several assignments of error presented by this appeal, attention should be given to the status, character, personality, environment and past record of the parties to this litigation, as shown by the record and the matters of which the court and jury may have had the right to take notice, as elements of common knowledge.

The profession of the plaintiff is that of a radio broadcaster, employed for a number of years by one of the Cincinnati radio stations. One of his programs consisted of an early morning broadcast, originating at his farm some distance outside of the city of Cincinnati. As pointed out by counsel for the defendant, he lived in a modest way and his neighbors were those customarily found in an agricultural district. Much of what he said over the radio consisted of homely, intimate chats, in which he discusses with his audience matters of interest to the community, connected with the political, economic, and social welfare of the city, state and nation. In the course of his morning program, he was accustomed to describe the various incidents of farm life, the activity of the animals about the place, and even what his young children were doing and saying. In such broadcasts, it is apparent that he made no pretension to superior status over his listeners. The incidents applicable to the issue of fluoridation involving the plaintiff will hereinafter be considered.

The defendant has, for over a century, published a newspaper. It has a circulation of more than 200,000. It has been recognized as one of the outstanding publications in its field. It is to be found on the newstands, not only of the city of Cincinnati and vicinity but also on those of the principal cities of the state of Ohio and the nation. All through the history of this publication, it has been noted for its accuracy in reporting events, the high character of its literary style, and the fair, unbiased and tolerant character of its editorial comment. Such comment, during its history, has invariably been predicated upon well-established facts, ascertained by thorough investigation by a competent staff. To a vast number of its readers, its position, if not entirely conclusive, on matters political, economic, and social has had the greatest weight. The reputation and

effect of the contents of the issue of the paper are, and were, undoubtedly known to the publishers of this outstanding newspaper.

On the morning of February 26, 1953, appeared the editorial and statement constituting the subject of this litigation. The readers of the defendant's newspaper must have been startled by the violent, vicious language of the articles in question, so entirely out of keeping with the customary restrained, fair and dignified comment found in the pages of the defendant's paper. Those readers must have wondered what could have caused such departure from the usual calm, fair comment appearing in the past. The reading matter was not a discussion of the issues, but a direct and vitriolic attack upon a man, whom also they had come to respect. The curiosity as to this change of type of editorial statement from such fair and impartial comment to personal attack is shared herein. An examination of the record discloses its cause.

It appears that the articles here involved were not submitted to the publisher of the Enquirer, Roger Ferger, because he was out of the city at the time, but were submitted to the assistant publisher, who had granted the request of one Hessler, an editorial writer for the defendant, to write the editorial. Hessler denies possessing any venom against the plaintiff. A reading of the matter involved belies this denial. It is stated in the record that certain changes were made in the editorial, after which it went to press without any further action by Hessler.

The controversy about the subject of fluoridation grew out of the declared intention of the council of the city of Cincinnati to fluoridate the drinking water of the city. The plaintiff became aroused over this proposal. It may be admitted that he became unduly so, and became also overvehement in presenting his views to his listeners, although, apparently, his apprehension was shared by the public of the city, who later voted down the project when the issue was submitted to the electors of the city. It is claimed by the defendant that the plaintiff was guilty of attacking the defendant in his broadcasts. Even if such comment had amounted to libel, this would not have been a defense to a libel by the defendant, although furnishing the basis for a

cross-petition against the plaintiff. The record fails, however, to show any attack upon the defendant justifying the charge of its counsel to that effect.

A preliminary question presented to the trial court, and which this court is required to determine at the outset, is whether the articles involved are libelous per se.

This could have been done by the trial court at the very outset of the trial, for the text and publication of the articles claimed to be libelous per se were admitted in the pleadings by counsel in the opening statement. It can be done by this court, since the same situation applies here. The entire consideration here presented on this appeal depends upon the conclusion reached. The trial court ultimately reached the conclusion that the articles constituted libel per se. In this conclusion, I agree. My associates hold the opposite opinion. This results in a widely divergent approach to the issues to be considered.

Libel is the written attack or assault upon a man's reputation. Reputation is what people think or say about a man. Reputation is not character, for character is what a man is, and a libel can not affect character. Reputation applied to a man is much like good will as applied to a business. A good reputation may be destroyed by written statements about a man by a publisher of such statements having a reputation for integrity and possessing influence among those who read such publication. Probably no better statement of what is involved was ever made than that by Shakespeare:

"Good name in man and woman, dear my lord,
Is the immediate jewel of their souls;
Who steals my purse steals trash; 'tis something, nothing;
'Twas mine, 'tis his, and has been slave to thousands;
But he that filches from me my good name,
Robs me of that which not enriches him,
And makes me poor indeed." Othello, Scene 3, Act III.

The publication of a false, defamatory, written statement may be couched in such language that no evidence other than the words themselves is required to demonstrate their lethal effect upon the reputation of the object to which they are addressed. A mere reading of the text of the defamatory statement is sufficient to produce contempt in the minds of the reader

of average intelligence. In other words, the language of the text is libelous per se. When such is the character of the defamatory statement, it is presumed that the person defamed has suffered an injury, and it is not necessary to establish special damages to his reputation. He is automatically entitled to a verdict finding the publisher of such false, defamatory statement liable in damages, unless such publisher has set up the truth of such statements as a defense and proved that his statements are true.

So, in an action based upon the publication of false, defamatory statements, the issues to be presented are:

(1) Did the defendant publish such written defamatory statements?

(2) Are the words employed of such a nature that a person of ordinary intelligence would hold the object of the publication in contempt and consider his reputation for integrity, decency, truth, or veracity impaired or destroyed?

(3) Are the statements true?

(4) Is the object of the publication entitled to more than mere nominal damages?

Malice has no part in such an action, at least as far as any burden on the plaintiff to prove it. Paradoxically, malice, if made known to the reader, may have a tendency to weaken the effect of the words employed. A statement made by one who is recognized as conservative, cautious in his statements and moderate in his comment will have much greater weight than one made by a person who is obviously motivated by anger, resentment and a vicious desire to injure.

In this case, the text of the libel and the publication are admitted, so that the first question in order is to determine whether the words employed are libelous in themselves—per se. It is a universal rule applicable to the publications involved, as well as to the construction of statutes, contracts, wills and other instruments, that, in determining the effect of such writings, the entire text should be considered as a whole. It may not be the effect of isolated statements that is entirely controlling. It is what is the effect of the entire composition that is presented for consideration. This principle is stated to be the law in the majority opinion. In this connection, I have no quarrel with the

law cited and quoted by the majority of the court. I adopt all those as support for the legal conclusion herein expressed. Too much emphasis has been laid on certain portions of these authorities, and parts supporting the conclusions herein reached have been ignored. All agree that it is the duty of the court to determine the nature of the written words. Are they libelous per se, is for the court to unequivocally instruct the jury. In that duty, the trial court failed, for, although such instruction, defining the words as libelous per se, was included in the charge, other statements were made during the trial, in the general charge and in the language of the special instructions requested by the defendant, which, most surely, left nothing but confusion in the minds of the jury upon this question.

A reading of the authorities upon which the majority rely demonstrates that in determining the question of whether the words are libelous per se, any query as to whether actual damage was suffered by the plaintiff is beside the point. It is not whether the plaintiff suffered actual damage, but rather, were the words used of such a character that they would be reasonably supposed to cause damage to the reputation of the plaintiff? Some damage, therefore, is presumed from the publication of words constituting libel per se. How much damage is a question for the jury, but it must at least find nominal damages when the words are found to be libelous per se and untrue. The question of privilege is also a question for the court.

Turning then to the publications, their contents will be examined for effect, both as to the component parts and as a whole. The title of the editorial is, ''Fluoridation: The Facts.'' The following statements, therefore, constitute a pronouncement of facts by the newspaper itself. It is not a news item. It is just as much the voice of the defendant as the later statement, so entitled. It is the pronouncement of a newspaper bearing the reputation hereinbefore noted. The reader might, therefore, have the right to presume that the statements, all the statements made therein were statements of facts, ascertained and examined after the customary employment of care, attributed to the publisher. In the very first lines of the editorial the writer develops the theme of the entire statement: ''In the last few days we have had a very *depressing* demonstration of

how much *harm* one newsbroadcaster can do in a community.''
(Emphasis added.)  The publisher states that the plaintiff has
caused harm to such an extent in the community, that ''we'' are
confronted with a demonstration resulting in depression—de-
jection.  The majority states that the ''we'' means the defend-
ant or the writer of the editorial.  I take it that ''we'' means the
citizens of the community, of which the writer, obviously, thinks
himself included.  It is not an editorial ''we,'' but rather an all-
inclusive ''we,'' as one will speak of a city, a state or a nation.
That charge then is stated as a fact, for the editor is stating
facts, according to the title of the editorial.  Certainly, if one
is charged with doing harm to a community, it can not be said
that his reputation for integrity, truth and veracity is not im-
pugned.  It is apparent that what is to follow is not to be ap-
plicable to the abstract subject of fluoridation, but to the news
broadcaster—the plaintiff—mentioned by name in the next line,
the harm-causing Tom McCarthy of WKRC.

He is then charged with efforts to create distrust of the
authorities, with misrepresenting the facts.  The word, ''mis-
represent,'' denotes falsity, an intention to mislead, a knowledge
of the truth and a purpose to conceal or distort it.  Can it be
said that those words in themselves are not an assault upon the
plaintiff's reputation for honesty and integrity, truth and ver-
acity as a news broadcaster?  By misleading statements, he has
caused widespread fear of death, of cancer, of tooth decay.  He
is not charged with mere error, with being mistaken, but, again,
the charge is that he has misled the community.  A willful
wrong, an active desire to cause erroneous conclusions, which
the plaintiff knew had no foundation in fact; this is the signifi-
cance of the word, ''misleading.''  He has set himself against
the welfare of the community, not only in this instance, but as
a part of a course of action.  This is the worst of his misdeeds,
states the editor.  Then follows a statement of what the writer
considers the facts about fluoridation, which he stated at the
trial were obtained from the news items furnished by the re-
porters employed by the defendant.

Following this statement of facts, the writer, in so many
words, charged the plaintiff again with concealing from the
public facts which to him were well known—''for reasons quite

his own." Again, he is charged with doing harm, causing needless fears, inciting (a word implying willful effort to arouse action) distrust of officials.

Defendant, not being content with this sustained villification of the plaintiff, charged him with a news reporting that victimizes the gullible listener—well chosen words to utterly destroy any shred of confidence the public may have had in the plaintiff. But now comes the final stab. The writer seeks to destroy plaintiff's position with his employer. Not only is it sought to discredit him in the community, but there is a direct attempt to cause the employer of the plaintiff to discharge him. Not once in the consideration of the words used has it been necessary to go beyond the words themselves to find the intent to destroy the plaintiff's reputation in the community for integrity and honesty, truth and veracity. There is no equivocation in words employed by the writer. A person would have to have the lowest of IQs not to despise Tom McCarthy after reading this editorial, avowedly containing nothing but "The Facts."

Defendant, not being content with having held the plaintiff up as an enemy of the community, a misrepresenter of facts known to him, with causing needless fears in the minds of the public and with merely following a course of such reprehensible conduct, charges plaintiff in the article, "The Voice of the Enquirer," with the lowest possible intentions, of doing all this for his own personal profit. It is claimed that this statement is merely facetious. Evidently, the writer wished to have two barbs on his shafts, and if what he had written did not arouse contempt of the plaintiff, then it was hoped that ridicule might serve his purpose in destroying his reputation in the community. The words used in these two writings are libelous per se, and the trial court so properly held. The claim that these statements are "fair comment" or are protected by the "freedom of the press" questions the intelligence of the court.

Let us be realistic. Citizen number one meets citizen number two. The plaintiff passes by. Number two asks, "who is that man?" Number one replies, "oh, that is Tom McCarthy, a news broadcaster for one of the radio stations here, and he should be discharged, for he has done great harm in the community, has stirred up needless and unjustified fear; he has

many times in the past misrepresented facts to the people, and his worst example setting himself against the welfare of the people is his misleading statements on fluoridation; he has tried to create distrust of our public authorities, and more than that, if this fluoridation should be installed, he will try to sell his spring water to the people for a dollar a bottle.'' ''But,'' says number two, ''how do you know all this to be true?'' ''Oh, I know all this is a fact for I read it in an editorial in the Enquirer, and you know the reputation of that paper for honest comment,'' replies number one. ''Well,'' says number two, ''that man should be fired as a news commentator, he is nothing more than a cheat and a liar.'' It is impossible to tell how many of the readers of defendant's paper reacted in just this way toward these articles, which the majority of this court consider so innocuous.

There is now taken up for consideration the initial element of the error, which was unquestionably the foundation of the verdict for the defendant. An amended answer was presented by the defendant. This pleading was attacked by the plaintiff. The court overruled the motions of the plaintiff because they were not timely interposed. There never can be an excuse for submitting to a jury a pleading which is nothing more than an argumentative statement of the position of a party. With the possible exception of a general denial, the so-called amended answer was nothing more than a brief for the defendant. It is claimed that truth was set up as a defense. The part of the pleading addressed to this defense was nothing more than an equivocal and most general mention of such defense. The plaintiff's motions should have been granted. This pleading initiated a course of presentation by the defendant, the manifest object and purpose of which was to obscure and confuse the simple issues in the case, hereinbefore set out.

One of the chief assignments of error was addressed to the giving of special charges numbers 1, 2, 5, 6, 7, 8, 10, 11, 14, 14a, 15 and 18, and to certain parts of the general charge. It would unduly extend this opinion to consider in detail the defects in these instructions. I consider the claims of the plaintiff applicable thereto fully sustained. The effect of giving these instructions was to hopelessly confuse the jury, so that the real is-

sues were never closely presented to it. No citation of authority is needed to sustain the proposition that the giving of a correct statement of law to the jury in no way destroys the prejudicial error of an incorrect statement of the law given the jury.

In the matter of the proof of damage, the record fails to show any damage, beyond what the plaintiff is entitled to, upon proof of libel per se, with no defense of truth; in other words "nominal damages." Ordinarily, an appellate court will not reverse a judgment for error which prevented the plaintiff from recovering a judgment for nominal damages. However, where, in addition to such nominal damages, the judgment in his favor would also have resulted in his vindication from the libel proved against him, and the costs of the trial were more than a mere nominal sum, such plaintiff is entitled to a reversal, where error prejudicial to his rights is shown.

For the reasons stated herein, the judgment should be reversed and the cause remanded for a new trial.