McCARTNEY, Appellant and Cross–Appellee,

v.

OBLATES OF ST. FRANCIS deSALES, Appellee and Cross–Appellant.

[Cite as *McCartney v. Oblates of St. Francis deSales* (1992), 80 Ohio App.3d 345.]

Court of Appeals of Ohio,
Lucas County.

No. L–91–007.

Decided May 29, 1992.

346

*George R. Smith, Jr.,* for appellant and cross-appellee.

*David J. Coyle* and *Thomas G. Pletz,* for appellee and cross-appellant.

MELVIN L. RESNICK, Judge.

This case is before the court on appeal from a judgment of the Lucas County Court of Common Pleas. That court granted defendants-appellees' motion for summary judgment on all claims alleged in plaintiff-appellant's complaint and denied plaintiff-appellant's motion for partial summary judgment. Plaintiff-appellant, John McCartney, appeals the lower court's judgment only as to his claim for slander and sets forth one assignment of error:

"I. The trial court erred in granting summary judgment to defendants on plaintiff's slander claim in that it improperly decided issues of material fact and engaged in a credibility analysis of affidavits submitted in support of defendants' motion for summary judgment."

Defendants-appellees, Oblates of St. Francis deSales, Father Ronald Olszewski and Father James Sanford filed a notice of cross-appeal and assert the following as error:

"Cross–Appellants' Assignment of Error No. 1

"The trial court erred by failing to grant cross-appellants-defendants' Motion to Strike Plaintiff's Motion for Reconsideration and the Affidavit of Adoracion Kelsey attached thereto.

"Cross–Appellants' Assignment of Error No. 2

"The trial court erred by finding that defendants made false statements which were actionable per se."

The undisputed facts which are material to our disposition of this case are as follows. McCartney was employed as a teacher at St. Francis deSales High School ("St. Francis") from August 1979 through June 1988. In 1980, McCartney became adviser to the St. Francis yearbook. In 1983, McCartney was convicted of contributing to the delinquency of a minor, a violation of R.C. 2919.24, for providing alcohol to one of his students. He informed St. Francis officials of the conviction and the circumstances leading to that conviction and was permitted to remain on the faculty both as a teacher and yearbook adviser.

After the 1987–1988 school year, McCartney's teaching contract was not renewed. In August 1988, McCartney filed a complaint against the Oblates of St. Francis deSales High School, Father Ronald Olszewski, Mark Lewis and George Demasco.[1] The complaint alleged that Father Olszewski, the principal of St. Francis, had ordered Lewis and Demasco to search the "Publications

---

1. The term "appellees" refers to the Oblates of St. Francis, Father Sanford and Father Olszewski. Demasco and Lewis are not parties to this appeal.

Room" in the high school for evidence linking McCartney to the publication of an unauthorized "underground" newspaper. McCartney claimed that Lewis and Demasco had invaded his privacy by conducting a search of his personal computer files and the "drawers" of his work station.

Father James Sanford was named adviser for the St. Francis yearbook for the school year 1988–1989. He was made aware of the fact that his predecessor had been convicted for "giving liquor to minors." In December 1988, Father Sanford scheduled a school-authorized "overnight" for the purpose of working on the yearbook. Students were required to obtain signed permission slips before they could remain at the school the entire night. On that night, three students, Miguel Buckenmeyer, Tom Lopresto and Mike Skaff, went to dinner with McCartney. Both Miguel and Tom were on the yearbook staff; Mike had previously resigned. McCartney then drove to St. Francis, dropped Miguel and Tom off and remained in the parking lot for "five to ten minutes."

In August 1989 McCartney dismissed, without prejudice, his original lawsuit. On December 14, 1989, he filed a new complaint in which he alleged, among other things, that Father Sanford and Father Olszewski had contacted the parents of two of his former students and, in separate instances, informed each set of parents that McCartney had been convicted of "corrupting a minor," implied that McCartney was a homosexual and indicated that their son should not associate with such a person. McCartney alleged that these communications were false, activated by malice, and made with reckless disregard of the truth. McCartney asserted that the false statements were made in retaliation against him for the filing of his first lawsuit. On February 13, 1990, appellees filed an answer and an unrelated counterclaim. Fathers Sanford and Olszewski raised privilege and truth as defenses to the claim of slander.

On September 28, 1990, appellees filed a motion for summary judgment on all claims set forth in McCartney's complaint. McCartney subsequently filed a motion for partial summary judgment on the issue of liability for slander. The motions were supported by the affidavits of Father Sanford, Father Olszewski, Roberta Lopresto (mother of Tom Lopresto) and Adoracion Kelsey (mother of Miguel Buckenmeyer), and by the depositions of Father Sanford, McCartney, Mrs. Kelsey, Mrs. Lopresto and their respective spouses, Richard Kelsey and Thomas Lopresto.

The following facts, both disputed and undisputed, are derived from the documents filed in support of the summary judgment motions.

On the evening of the overnight, Father Sanford telephoned the Lopresto residence and spoke with Mrs. Lopresto. According to her affidavit and

deposition testimony, Father Sanford told Mrs. Lopresto that someone (student, faculty member) saw Tom drinking alcohol with McCartney in the St. Francis parking lot on that night. Subsequently, both Mr. and Mrs. Lopresto attended a meeting with Father Sanford and Father Olszewski to discuss this incident. At that meeting, Father Olszewski stated that (1) McCartney had been convicted of "corrupting a minor and sentenced to six months in jail"; (2) McCartney was overinvolved with the yearbook, *i.e.*, the yearbook was his whole life and "he just put too much time and involvement with the boys into it"; and (3) a mistake was made as to the allegation of drinking. Mrs. Lopresto testified that she inferred from these statements the possibility that McCartney might be a homosexual. However, Mr. Lopresto directly asked the priests whether they suspected McCartney was a homosexual, and they answered in the negative.

In uncontroverted deposition testimony, Father Sanford testified that Miguel and Mike Skaff were appointed editors-in-chief of the yearbook by McCartney. When Father Sanford assumed the duties of yearbook adviser, he informed the staff that they would be re-evaluated for a period of two months. At the end of October 1988, both Miguel and Mike were reassigned. Miguel became the design editor. Father Sanford was concerned because Miguel still contacted McCartney and discussed the layout and design of the yearbook with him rather than with his current adviser. In fact, Miguel had requested that he be allowed to take materials from the publication room to McCartney. McCartney and Mr. and Mrs. Kelsey admitted that Miguel kept in contact with the former adviser during the 1988–1989 school year. McCartney testified that even after the Kelseys met with Fathers Sanford and Olszewski, ninety-eight percent of his contact with Miguel involved the production of the yearbook. He further stated that his former students would call him to discuss issues related to the publication of the 1989 yearbook and that he would act as a "sounding board" for their "gripes" and complaints. In his deposition, Father Sanford testified that he held the overnight because the yearbook staff claimed that they had previously participated in such activities; therefore, he tried to meet them "halfway" by scheduling the overnight. In both his affidavit and deposition, Father Sanford stated that he was responsible for the supervision of the staff during the course of the overnight. It is uncontroverted that Father Sanford observed both Miguel and Tom working in the media center at some point during the evening. A short time later he noticed that they were gone. In his affidavit he attested to the fact that a student told him that he, the student, had seen Miguel, Tom and Mike drinking beer in a car with McCartney. In his deposition, Father Sanford stated that when he inquired as to the whereabouts of Miguel and Tom, he was informed that they had left. One student, Chad Beutler, reported that he had observed

Miguel and Tom get into the car with McCartney and leave. Father Sanford then asked Father Olszewski whether he should contact the parents of Tom and Miguel to let them know they were not at the school and was told to do so.

In her deposition, Mrs. Kelsey testified that she initiated contact with Father Sanford because she was concerned with Miguel's status on the yearbook staff. During the telephone conversation,[2] Father Sanford informed her that McCartney had "spent time in jail for corrupting minors" and queried, "You don't want your son to have something to do with a person like that, do you?" Mrs. Kelsey stated, that as a mother, she drew an inference of homosexuality as to McCartney from these statements. Mrs. Kelsey admitted that Miguel got advice from McCartney with regard to the 1989 yearbook and that she could understand why Father Sanford would object to this relationship. According to Mrs. Kelsey, when the Kelseys met with Father Sanford and Father Olszewski, the priests asserted, "a couple of times," that it was not proper for someone Miguel's age to associate with someone of McCartney's age. Fathers Sanford and Olszewski also insisted that Miguel refrain from associating with McCartney as a condition to his continued participation on the yearbook staff. In his deposition, Father Sanford noted that this condition was also imposed upon Tom, but added that the scope of the condition related only to advice on yearbook activities.

On September 22, 1991, the supplemental affidavits of Father Sanford and Father Olszewski were filed. These identical affidavits stated, in pertinent part:

"All statements or comments I made concerning John McCartney to Mr. Lopresto, Mrs. Lopresto, Mr. Kelsey and/or Mrs. Kelsey were made in good faith with the intent of furthering our common interest in the education, safety, development and well-being of their respective children who were students at St. Francis. Every such statement was true and I had a reasonable belief that each such statement was true. Each such statement was also reasonably calculated to protect or further my common interest with the parents in the children-students."

On December 3, 1990, the trial court journalized an opinion and judgment entry in which it found that by using the phrase "corrupting a minor" in describing McCartney's criminal conviction, Fathers Sanford and Olszewski had made slanderous statements which were actionable *per se*. Nevertheless,

---

2. Father Sanford indicated that he stated that McCartney was convicted of "corrupting a minor" at the meeting with the Kelseys rather than on the telephone. The important fact, however, is that he did admit to making that statement.

the court below further determined, as a matter of law, that the defense of qualified (conditional) privilege existed and that McCartney had failed to present evidence of the actual malice necessary to defeat the privilege. McCartney's motion for partial summary judgment was denied and appellee's motion for summary judgment was granted in its entirety. Civ.R. 54(B) certification was included in the final judgment.

McCartney filed a motion for reconsideration supported by the affidavit of Mrs. Kelsey on December 21, 1990. The motion was denied. This timely appeal and cross-appeal followed.

We shall address appellees' cross-appeal first.

In their first assignment of error, appellees assert that this court cannot consider McCartney's motion for reconsideration and the affidavit in support of that motion. We agree.

■ A motion for reconsideration which is filed after the entry of final judgment on a claim is a nullity. *Pitts v. Dept. of Transp.* (1981), 67 Ohio St.2d 378, 381, 21 O.O.3d 238, 240, 423 N.E.2d 1105, 1107. In the case before us, final judgment, including the language required by Civ.R. 54(B), was entered on December 3, 1990. See *Noble v. Colwell* (1989), 44 Ohio St.3d 92, 540 N.E.2d 1381; *Sakian v. Taylor* (1984), 18 Ohio App.3d 62, 63, 18 OBR 175, 176, 480 N.E.2d 822, 823. Therefore, the motion for reconsideration (and affidavit in support) was a nullity and will not be considered by this court in the determination of this appeal. Appellees' first cross-assignment of error is found well taken.

In their second cross-assignment of error, appellees contend that the trial court erred in finding that McCartney had any actionable claim for slander. The sole issue before this court is whether any and all defamatory statements made by Father Sanford and Father Olszewski were made in a circumstance giving rise to a claim of qualified privilege. Thus, unless this court reverses the trial court on the issue of privilege, appellees' assertions with regard to the lower court's ruling on the statements which are the basis of McCartney's slander claim are immaterial. Moreover, as mentioned below, we agree with the trial court's characterization of the statement indicating that McCartney was convicted of "corrupting a minor." Because we affirm the judgment of the trial court on the privilege issue, appellees' second cross-assignment of error is found not well taken.

In his sole assignment of error, McCartney contends that the trial court erred in granting summary judgment on his slander claim by engaging in a credibility analysis of the evidence offered in support of the motions for summary judgment.

Summary judgment is a method for promptly disposing of actions in which there is no genuine issue as to any material fact. *Norris v. Ohio Std. Oil Co.* (1982), 70 Ohio St.2d 1, 2, 24 O.O.3d 1, 2, 433 N.E.2d 615, 616. It can be awarded only where reasonable minds, in construing the evidence in a light most favorable to the non-moving party, can reach but one conclusion and that conclusion is adverse to the non-moving party. *Id.;* Civ.R. 56(C). Then, and only then, is the moving party entitled to summary judgment as a matter of law. Civ.R. 56(C). The moving party bears the burden of showing no genuine issue exists as to any material fact. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 74, 375 N.E.2d 46, 47. Once the moving party provides specific reasons for summary judgment with supporting evidence, the non-moving party bears a reciprocal burden to produce evidence on any issue for which that party bears the burden of production. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 111, 570 N.E.2d 1095, 1099, citing *Celotex v. Catrett* (1986), 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273. See, also, *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202, 216.

Defamation is the unprivileged publication of a false and defamatory matter about another. *McCarthy v. Cincinnati Enquirer, Inc.* (1956), 101 Ohio App. 297, 1 O.O.2d 131, 136 N.E.2d 393. A defamatory statement is one which tends to cause injury to a person's reputation or exposes him to public hatred, contempt, ridicule, shame or disgrace or affects him adversely in his trade or business. *Matalka v. Lagemann* (1985), 21 Ohio App.3d 134, 136, 21 OBR 143, 145, 486 N.E.2d 1220, 1222. See, generally, Restatement of the Law 2d, Torts (1977) 156, Section 559. Slander consists of oral defamatory statements. Restatement of the Law 2d, Torts, *supra*, at 177, Section 568. There are two actionable types of slander: slander *per se* and slander *per quod*. *Rainey v. Shaffer* (1983), 8 Ohio App.3d 262, 264, 8 OBR 354, 356, 456 N.E.2d 1328, 1331. Slander *per quod* is defined as slander determined by the interpretation of the listener, through innuendo, as between an innocent or harmless meaning and a defamatory one. *Rainey, supra.* See, also, *Becker v. Toulmin* (1956), 165 Ohio St. 549, 556, 60 O.O. 502, 505, 138 N.E.2d 391, 397 (distinguishing libel *per se* from libel *per quod* ). Slander *per se* means that the slander is accomplished by the very words spoken. *Rainey* and *Becker.* In order for an oral defamatory remark to be considered slander *per se* it must consist of words which import an indictable criminal offense involving moral turpitude or infamous punishment, imputes some loathsome or contagious disease which excludes one from society or tends to injure one in his trade or occupation. See *Schoedler v. Motometer Gauge & Equip. Co.* (1938), 134 Ohio St. 78, 84, 11 O.O. 487, 490, 15 N.E.2d 958, 960. See, generally, Restatement of the Law 2d, Torts, *supra*, Section 570. The determination of

whether a statement is slander *per se* or slander *per quod* is a question of law for the trial court. *Matalka, supra.* Depending on this determination the defamation action will be either *per se* or *per quod.* *Fish v. Heatherdowns Country Club Assn.* (June 7, 1991), Lucas App. No. L–90–072, unreported, 1991 WL 97324. If the statements are deemed to be actionable *per quod,* the plaintiff must allege and prove damages. *Becker, supra,* at paragraphs three and four of the syllabus. If the statements are found to be actionable *per se,* both damages, *id.,* 165 Ohio St. at 553, 60 O.O. at 504, 138 N.E.2d at 395, and actual malice, *Westropp v. E.W. Scripps Co.* (1947), 148 Ohio St. 365, 35 O.O. 341, 74 N.E.2d 340, paragraph four of the syllabus, are presumed to exist. See, also, *Fish, supra.* Only where the court determines that the words in the published statement are ambiguous and that a defamatory meaning may be reasonably understood by innuendo does the trier of fact determine whether, in fact, the defamatory meaning was understood. *Becker, supra,* paragraphs one and two of the syllabus; *Matalka, supra.*

 Even in cases where a plaintiff has established a prima facie case of defamation, a defendant may invoke the defense of qualified privilege. *Hahn v. Kotten* (1975), 43 Ohio St.2d 237, 243, 72 O.O.2d 134, 138, 331 N.E.2d 713, 718. A publication is privileged when it is " 'fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned.' " *Id.* at 243–244, 72 O.O.2d at 138, 331 N.E.2d at 718, quoting *Toogood v. Spyring* (1834), 149 Eng.Rep. 1044, 1 Crompton, Meeson & Roscoe 181. As stated by the *Hahn* court, a publication is:

" * * * conditionally or qualified privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or where the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do. This general idea has been otherwise expressed as follows: A communication made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which, without this privilege, would be actionable, and although the duty is not a legal one, but only a moral or social duty of imperfect obligation. The essential elements of a conditionally privileged communication may accordingly be enumerated as good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only. The privilege arises from the

necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty, and is not restricted within any narrow limits." (Emphasis omitted.) *Hahn, supra,* 43 Ohio St.2d at 245–246, 72 O.O.2d at 139, 331 N.E.2d at 719.

McCartney maintains that the determination of qualified privilege was a question of fact because the issue of the credibility of Father Sanford's testimony created issues of fact as to whether the statements were made in good faith, on a proper occasion and in a proper manner.

[14, 15] Where the circumstances of the occasion for the alleged defamatory communication are not in dispute, the determination of whether there is a qualified privilege is a question of law for the trial court. *Mauk v. Brundage* (1903), 68 Ohio St. 89, 67 N.E. 152. See, also, *Worrell v. Multipress, Inc.* (1989), 45 Ohio St.3d 241, 248, 543 N.E.2d 1277, 1283; *Williams v. P.W. Publishing Co.* (App.1957), 76 Ohio Law Abs. 404; *Fish, supra; John Hancock Mut. Life Ins. Co. v. Zalay* (Fla.App.1991), 581 So.2d 178; *Soentgen v. Medcenter One, Inc.* (N.D.1991), 467 N.W.2d 73; *Happy 40, Inc. v. Miller* (1985), 63 Md.App. 24, 491 A.2d 1210. See, generally, Prosser & Keeton, The Law of Torts (5 Ed.1984) 835, Section 115; Restatement of the Law 2d, Torts, *supra,* at 316, Section 619(1); 2 Harper, James & Gray, The Law of Torts (2 Ed.1986) 248, Section 5.29; Sanford, Libel and Privacy (2 Ed.1991) 507, Section 10.5.1. Thus, it is only where the content of the defamatory communication and/or the circumstances under which it is published are unclear under the evidence that the question of whether a qualified privilege exists is one for the jury. See *Theiss v. Scherer* (C.A.6, 1968), 396 F.2d 646, 650 (the contents of an allegedly defamatory letter and the circumstances surrounding its publication were not in dispute. Privilege was, therefore, a question of law for the court); *Boden v. Anaconda Minerals Co.* (S.D.Ohio 1990), 757 F.Supp. 848, 856 (subjective good faith was factual because defendants failed to establish content of the statement relied on to establish an occasion giving rise to a qualified privilege).

 In the instant case, there is no dispute as to the circumstances under which the defamatory remarks were made or the contents of those remarks. Father Sanford stated that McCartney had been convicted of "corrupting a minor" either in a telephone conversation with Mrs. Kelsey or in a conference with both parents. Mrs. Kelsey had initiated that telephone conversation and subsequent conference because she was worried about the possibility that Miguel would be asked to resign from the yearbook staff. At the Kelsey conference, the undisputed testimony of Mrs. Kelsey indicates that the teacher and principal stated "a couple of times" that it was not proper for a person of Miguel's age to associate with someone who was McCartney's age. View-

ing the evidence in a light most favorable to McCartney, Father Sanford called Mrs. Lopresto on the evening of the overnight and told her that someone saw Tom drinking alcohol in the St. Francis parking lot with McCartney. The conference with the Loprestos was a direct result of this alleged incident. Again, construing the evidence in favor of McCartney, Father Olszewski told the Loprestos at this meeting that (1) McCartney had been convicted of "corrupting a minor"; (2) McCartney was overinvolved with the yearbook and put too much time into it and the boys involved; and (3) a mistake was made as to the drinking of alcohol. The conditions under which the defamatory remarks were published were undisputed. It is clear that the *content* of those remarks, *e.g.*, conviction for "corrupting a minor" are also *undisputed.* Accordingly, the lower court properly determined the issue of qualified privilege as a matter of law.

A review of the trial court's judgment discloses that it did not impermissibly engage in an assessment of credibility on a motion for summary judgment. Rather, the court below recognized that the concept of qualified privilege is based upon public policy and the need to protect a publication made in good faith. *Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 114, 573 N.E.2d 609, 612. The elements of the qualified privilege, including good faith, set forth in *Hahn, supra,* are fully satisfied by showing that the relationship of the parties to the communication is *"such as to afford a reasonable ground for supposing an innocent motive for giving information and to deprive the act of an appearance of officious intermeddling in the affairs of others."* (Emphasis added.) *Hahn, supra,* 43 Ohio St.2d at 246, 72 O.O.2d at 140, 331 N.E.2d at 720, quoting *West v. Peoples Banking & Trust Co.* (1967), 14 Ohio App.2d 69, 72, 43 O.O.2d 197, 199, 236 N.E.2d 679, 682.

As a matter of public policy, educators and parents share a common interest in the training, morality and well-being of the children in their care. Because of this shared interest, a relationship exists between the educators of a child and the parents of that child in which a right, and in many instances a duty, to communicate information concerning the education and well-being of that child arises. The occasions presented in this case are examples of such a relationship. With regard to Miguel, Father Sanford was aware of his relationship with McCartney and how it was affecting Sanford's ability to advise the yearbook staff. In his deposition testimony, McCartney himself stated that Miguel often called him to talk about the yearbook and that former students telephoned to gripe and complain about the manner in which Father Sanford coached the staff. Further, it is undisputed that a student told Father Sanford that Tom and Miguel were observed leaving school property with McCartney on the evening of the overnight. In fact, in his deposition, Father Sanford named the specific student who provided him with

this information. McCartney testified that he saw the same student and spoke to him while he was waiting in the school parking lot. Whether or not they were staying for the entire overnight, Father Sanford was responsible for the safety and well-being of those students who were engaged in an afterschool activity on school grounds. Therefore, he had a right to contact the parents of the young men who were observed leaving. Further, in uncontroverted testimony, Father Sanford asserted that the overnight was held at the request of members of the students' staff and was for the purpose of bettering his relationship with his students. Clearly, the priests had at least two common interests with the parents under these circumstances. First, both they and the parents of Miguel and Tom had their well-being and safety in common. Second, all parties desired the children's continued association with the yearbook and a better relationship with the faculty adviser in charge of that yearbook. Under these circumstances, statements made by a teacher and a principal which relate to a former teacher's interference in the educational process or commission of acts which are potentially harmful to the well-being of a student, when made to the parents of the student involved, can be motivated by a common interest in education and/or safety of that student. Further, the statements were imparted only to those parents who had a common interest in their continued association with the yearbook and the incident on the evening of the overnight. Accordingly, the trial court properly found that a qualified privilege existed as a matter of law. As a consequence, McCartney was required to offer clear and convincing evidence that the communication was made with actual malice. *Jacobs v. Frank* (1990), 60 Ohio St.3d 111, 573 N.E.2d 609, at paragraph two of the syllabus.

"Actual malice," as defined by the Supreme Court of Ohio, is "acting with the knowledge that the statements are false or acting with reckless disregard as to their truth or falsity." *Id.* The *Jacobs* court noted that actual malice cannot be inferred from evidence of intent to injure, ill will or personal spite. *Id.* at 118, 573 N.E.2d at 615, quoting *Dupler v. Mansfield Journal Co., Inc.* (1980), 64 Ohio St.2d 116, 119, 18 O.O.3d 354, 356, 413 N.E.2d 1187, 1190. Rather, the evidence must demonstrate with convincing clarity that the defendant or defendants were aware of a high probability of falsity. *Id.* at 119, 18 O.O.3d at 356, 413 N.E.2d at 1190. In the present case, both Father Sanford and Father Olszewski filed supplemental affidavits in which they averred that the statements to the parents of Miguel and Tom were made in good faith with the intent of furthering the education, development and safety of those young men. McCartney could not, therefore, rely upon the conclusory allegations in his complaint to establish actual malice. *Id. Evely v. Carlon Co.* (1983), 4 Ohio St.3d 163, 166, 4 OBR 404, 407, 447 N.E.2d 1290, 1293. There is no evidence offered by McCartney in the record

of this case which goes beyond the conclusory allegations in his pleadings. In his brief on appeal he sets forth several allegations which he claims are evidence of a lack of good faith or evidence of actual malice. Essentially, he asserts that the statements were motivated by spite (retaliation for his filing of a lawsuit), ill will (because he was a better teacher than Father Sanford) and jealousy (because he had a better relationship with his students that Father Sanford). However, there is no evidence in the record to support these allegations and even if such had been offered, any inferences drawn from that evidence are insufficient to defeat the privilege. The record is devoid of any evidence which would create an issue of *material* fact as to whether Father Sanford or Father Olszewski was aware of a high probability of falsity as to the statement that McCartney had been convicted of "corrupting a minor." Because the statement must be viewed on the *subjective* belief of the *author, Jacobs, supra,* that evidence which is important in this case is the fact that both Father Sanford and Father Olszewski knew of the conviction based on providing alcohol to a student and connected this conduct with the offense of "corrupting a minor." It was the subjective belief that they were imparting information as to a conviction itself, not the nomenclature, which was important to the discussions with the parents of Miguel and Tom. For these reasons, McCartney's sole assignment of error is found not well taken.

*Judgment affirmed.*

HANDWORK, P.J., concurs.

ABOOD, J., dissents.

ABOOD, Judge, dissenting.

I would find that there exists a genuine issue of material fact as to whether a qualified or conditional privilege exists in this case.

Additional evidence that was before the trial court is as follows. When McCartney was convicted in 1983 for contributing to the unruliness and delinquency of a minor, he immediately informed St. Francis officials and faculty about the conviction and the circumstances leading to that conviction. Despite this knowledge, St. Francis officials saw no reason to limit or sever McCartney's contact with the students at St. Francis and permitted McCartney to remain on the faculty both as a teacher and yearbook adviser for a period of five years following his conviction. When Miguel and Tom joined the yearbook three years later, McCartney told them about his conviction. Miguel and Tom's parents were also told about McCartney's conviction. (Also, according to Mr. McCartney, Mr. Lopresto and Father Sanford's testimony, McCartney's 1983 conviction was well known). Nevertheless, Miguel and Tom were permitted to develop a close relationship with McCartney which

proved to be positive and beneficial to them. In the early months of 1988, St. Francis officials began to suspect McCartney's participation in the publication of an "underground" student newspaper. In response, they raided the yearbook publications office, searched McCartney's desk, terminated his employment and replaced him with Father Sanford as yearbook adviser. As a result, McCartney filed his first lawsuit against appellees (with the exception of Father Sanford), alleging defamation and invasion of privacy. Within two months of taking over as yearbook adviser, Father Sanford demoted Miguel and Tom, who had continued to associate with McCartney, from their former positions on the yearbook staff.

As to Miguel, Father Sanford was continuously "picking on him" and threatening to fire him from the yearbook staff. When Miguel's mother, Adoracion Kelsey, called Father Sanford to discuss this matter with him, he turned the conversation " * * * in a different direction"; "out of nowhere," he said that " * * * McCartney had spent time in jail for corrupting minors, and he said something to the fact you don't want your son to associate with somebody like that." As to the meeting that followed several days later between the Kelseys and Fathers Sanford and Olszewski, Mr. Kelsey stated:

"The whole meeting, the first part of the meeting, was just a continual attack on him (McCartney) * * * I just knew it was over and over again at every turn and angle."

Mrs. Kelsey had to remind Fathers Sanford and Olszewski several times that the meeting between them was not to discuss McCartney. Fathers Sanford and Olszewski then imposed the *absolute* restriction that Miguel not associate with McCartney *at all*, or he would be fired from the yearbook staff. Mrs. Kelsey summarized the events as follows:

" * * * The whole situation did him (Miguel) a lot of harm * * *. He was innocent. *He was caught up between* two people, *two people fighting*, and he was caught up in the middle." (Emphasis added.)

As to Tom, on the night of the "overnight," Father Sanford, knowing that McCartney's 1983 conviction involved giving alcohol to a St. Francis student, telephoned Mrs. Lopresto and told her that a student had witnessed her son drinking in the St. Francis parking lot with McCartney. After confirming that her son had not been drinking that night, Mrs. Lopresto called Father Sanford to inform him of such and, at that time, "Fr. Sanford changed his story by indicating that a faculty member of the school saw my son drinking alcohol with John McCartney." Mrs. Lopresto then agreed to attend a meeting with Fathers Sanford and Olszewski because she was afraid that her son would be expelled from school for drinking. At the meeting, Fathers Sanford and/or Olszewski said that McCartney had been convicted of corrupting a minor and

that it was unhealthy for him to be with boys Tom's age. "At the end of the meeting Fr. Olszewski said he was mistaken about my son drinking and that the matter was closed."

As to the issue of privilege, the majority correctly points out that all that is necessary to entitle such communications to be regarded as privileged is, that the relation of the parties should be " 'such as to afford reasonable ground for supposing an innocent motive for giving information, and to deprive the act of an appearance of officious intermeddling with the affairs of others.' " *Hahn v. Kotten* (1975), 43 Ohio St.2d 237, 246, 72 O.O.2d 134, 140, 331 N.E.2d 713, 720, quoting *West v. Peoples Banking & Trust Co.* (1967), 14 Ohio App.2d 69, 74, 43 O.O.2d 197, 200, 236 N.E.2d 679, 682. Further, although the majority opinion contains no direct authority applying the privilege to an occasion involving communications between school teachers and/or officials and parents of a student on matters pertaining to their common interest in the student, it is clear that such an occasion would generally warrant application of the privilege. See, *e.g., Nodar v. Galbreath* (Fla.1984), 462 So.2d 803; *Dobbyn v. Nelson* (1978), 2 Kan.App.2d 358, 579 P.2d 721.

On the other hand, the essential elements of a conditionally privileged occasion include good faith and an interest to be upheld. *Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 113–114, 573 N.E.2d 609, 612; *Hahn, supra,* 43 Ohio St.2d at 245–246, 72 O.O.2d at 139, 331 N.E.2d at 719; *West, supra,* 14 Ohio App.2d at 72, 43 O.O.2d at 199, 236 N.E.2d at 681; *Boden v. Anaconda Minerals Co.* (S.D.Ohio 1990), 757 F.Supp. 848, 856–857; 50 American Jurisprudence 2d (1970) 701, Libel and Slander, Section 196; Prosser & Keeton, Law of Torts (5 Ed.1984) 826–829, Section 115; Restatement of the Law 2d, Torts (1965) 258, Scope Note; 2 Harper, James & Gray, The Law of Torts (2 Ed.1986) 219, Section 5.26; 3 Lee & Lindahl, Modern Tort Law (1990) 254, Section 36.22; Eldridge, The Law of Defamation (1978) 461–481, Sections 86 and 87; Sack, Libel, Slander and Related Problems (1980) 303–304, 310–313, Sections VI.3.3. and 3.4. If the surrounding circumstances, therefore, indicate that the occasion is being used as a pretext to advance, in bad faith, an interest that is not entitled to protection, the privilege would not attach to protect defamatory communications made on such an "occasion." See, *e.g., Boden, supra,* 757 F.Supp. at 856–857.

The concept of pretext is well stated at 50 American Jurisprudence, *supra,* at 701–703, Sections 196 and 197, wherein it is explained that:

"The occasion and circumstances under which a communication is made determine whether it is privileged. Mere color of a lawful occasion and pretense of a justifiable end cannot shield from liability a person who publishes and circulates defamatory matter. If the defamatory matter was

long known to the defendant and to the community, a charge relating thereto is not entitled to protection as qualifiedly privileged on the theory that there was a privileged occasion for publication thereof.

" * * *

"The existence of a conditional or qualified privilege depends upon the bona fides of the communication, and in determining whether or not it exists the court will look to the primary motive or purpose by which the defendant apparently was inspired. The privilege attaches only if the communication was made in good faith to serve the interests of the publisher and the person to whom it was addressed, and it does not exist if the privileged occasion was abused. There is no privilege if the publication was made primarily for the purpose of furthering an interest that is not entitled to protection * * *."

As to the functions of judge and jury, although there is some authority for the position that the issue of conditional privilege is always a question of law, I agree with the majority that the better rule is that where the material facts are in dispute, it is the function of the jury to resolve that factual dispute.

" * * * Undoubtedly the very vagueness of the rules (of privilege) * * * has been of considerable aid to the courts in achieving a degree of flexibility which permits the particular issue to be determined by the court or passed over to the jury, as the particular case seems to demand." Prosser & Keeton, Law of Torts, *supra*, at 835–836. See, also, *West, supra*, 14 Ohio App.2d at 74–75, 43 O.O.2d at 200, 236 N.E.2d at 682, quoting 1 Harper & James, The Law of Torts (1956) 466, Section 5.29; 50 American Jurisprudence 2d, *supra*, at 708–709, Section 200.

In summary judgment proceedings " * * * the presence of competing reasonable inferences from undisputed facts presents a genuine issue of material fact whose resolution should be left to the trier of fact." *Duke v. Sanymetal Products Co.* (1972), 31 Ohio App.2d 78, 81, 60 O.O.2d 171, 178, 286 N.E.2d 324, 327, quoting *Franklin Natl. Bank v. L.B. Meadows & Co.* (E.D.N.Y.1970), 318 F.Supp. 1339, 1344; see, also, *Washington Cty. Farm Assn. v. B. & O. RR.* (1972), 31 Ohio App.2d 84, 91, 60 O.O.2d 174, 178, 286 N.E.2d 287, 291. An inference is not impermissible just because it is based in part on another inference or common human experience. *Motorists Mut. Ins. Co. v. Hamilton* (1986), 28 Ohio St.3d 13, 28 OBR 77, 502 N.E.2d 204, syllabus; *Hurt v. Charles J. Rogers Transp. Co.* (1955), 164 Ohio St. 329, 58 O.O. 122, 130 N.E.2d 820, paragraph two of the syllabus; *Neeper v. Cherry Street Mission* (Mar. 13, 1992), Lucas App. No. L–91–159, unreported, 1992 WL 48515.

Upon consideration of the entire record of proceedings that was before the trial court in this case, and the law, I would find that there remains a genuine

issue of material fact as to the circumstances under which the defamatory statements were made. Although statements in furtherance of the education and well-being of students may be conditionally privileged, a reasonable inference can be drawn from the evidence that was before the trial court that the defamatory statements were made by appellees solely to support their personal, legal and political interests. For this reason, I must dissent.