[Cite as *Johnson v. Ohio Bd. of Nursing*, 2009-Ohio-7100.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us


DELORES JOHNSON

    Plaintiff

    v.

OHIO BOARD OF NURSING

    Defendant
    Case No. 2004-10876

Judge Alan C. Travis

DECISION


{¶ 1} Plaintiff brought this action alleging defamation, intentional infliction of emotional distress, and civil conspiracy. The issues of liability and damages were bifurcated and the case proceeded to trial on the issues of liability and civil immunity.[1]

{¶ 2} In 1999, plaintiff was a Licensed Practical Nurse (LPN) working as an independent healthcare provider for a company known as CareStar. CareStar had contracted with the Ohio Department of Job and Family Services (ODJFS) for the provision of healthcare services to ODJFS clients.

{¶ 3} In August 2001, plaintiff was hired to provide nursing care to Lakisha Williams, a minor child who lived with her father Alan Williams. Lakisha was 10 or 11 years old at that time and had been diagnosed with Rhett's syndrome, cerebral palsy, and seizure disorder. Lakisha required a ventilator and needed 24-hour awake care; she was neither ambulatory nor verbal.

---

[1] For good cause shown, defendant's oral motion to submit Defendant's Exhibits JJ, KK, MM, NN, and QQ under seal is GRANTED.

{¶ 4} Initially, plaintiff was to provide 12 hours of care per day and another nurse was to provide the remaining 12 hours of care. However, by early 2002, plaintiff was providing a majority of Lakisha's care. With her father's consent, plaintiff moved Lakisha into plaintiff's own residence in December 2002. Williams testified that he continued to visit Lakisha every other day for one to two hours per visit. Although plaintiff claims that the arrangement was authorized on a permanent basis by both CareStar and ODJFS, the weight of the evidence does not support such a claim.

{¶ 5} Lakisha was taken to the emergency room at Children's Hospital on February 14, 2003, with an elevated temperature and she was subsequently admitted to the pediatric intensive care unit.

{¶ 6} On February 28, 2003, Mary Counts, a regional manager with CareStar, conducted a meeting at Children's hospital regarding plaintiff's care of Lakisha. In attendance were plaintiff, Williams, a hospital discharge planner, and some other unidentified healthcare providers. As a result of that meeting, CareStar informed Williams that ODJFS would no longer authorize an independent home healthcare provider for Lakisha. Williams' appeal to a state hearing examiner was denied.

{¶ 7} Plaintiff was not involved in Lakisha's care following her admission to Children's Hospital. Lakisha died on August 27, 2004, at the Villa Angela Care Center.

{¶ 8} On March 31, 2003, defendant, Ohio Board of Nursing (OBN), issued to plaintiff a "Notice of Operational Deficiency" and opened an investigation into plaintiff's care of Lakisha. OBN's compliance agent, Bette Jo Horst, R.N., was assigned to conduct the investigation under the supervision of OBN's compliance manager, Lisa Ferguson-Ramos, R.N., J.D. Horst visited plaintiff's home and then met with plaintiff and her legal counsel in June 2004.

{¶ 9} According to Horst, plaintiff admitted that she had moved Lakisha into her residence in December 2002 and she told Horst that she had "loved the child." Horst considered plaintiff's admission to be a red flag inasmuch as a nurse is required to remain objective. As a result of the meeting, Horst formed the opinion that plaintiff was "overly involved with the case" and that she had committed a "boundary violation." Horst was also concerned that plaintiff was unable to provide basic information about Lakisha's care and that she did not respond appropriately to simple inquiries regarding the proper use of necessary medical equipment. Horst suspected that plaintiff had not

properly documented Lakisha's case, and that prescribed medical equipment, including a ventilator, had not been used. Horst subsequently received records from plaintiff pursuant to an administrative subpoena and her review of those records revealed serious deficiencies in plaintiff's record-keeping.

{¶ 10} On January 16, 2004, OBN issued a Notice of Opportunity for Hearing (Notice) pursuant to R.C. 119.07 wherein plaintiff was informed of the commencement of proceedings to revoke her license, the specific charges against her, and her opportunity to request a hearing. On July 19, 2004, Ferguson-Ramos sent correspondence to plaintiff informing her that the January 16, 2004 Notice had been dismissed but that plaintiff would be receiving a second Notice dated July 16, 2004. In the correspondence, Ferguson-Ramos explained that the January 16, 2004 Notice was being issued "based upon evidence discovered subsequent to January 16, 2004."

{¶ 11} The July 16, 2004 Notice recites the information contained in the first Notice and the aforementioned additional evidence. On October 28, 2004, OBN conducted an evidentiary hearing to determine plaintiff's suitability as an LPN. The only OBN employee to give testimony at the hearing was compliance agent Bette Jo Horst, R.N. Plaintiff appeared at the hearing and read a prepared statement.

{¶ 12} On December 13, 2004, the OBN hearing examiner issued a Report and Recommendation (Report) wherein he recommended the permanent revocation of plaintiff's nursing license. Plaintiff timely filed her objections to that recommendation on December 15, 2004. On January 21, 2005, OBN issued an Adjudication Order (Order) overruling plaintiff's objections and adopting the hearing officer's report and recommendation as its own. Plaintiff's license to practice nursing as an LPN was permanently revoked.

{¶ 13} Plaintiff filed a complaint in the Franklin County Court of Common Pleas pursuant to R.C. 119.12 on July 23, 2004. On October 6, 2004, the court of common pleas dismissed her complaint; thereupon plaintiff filed a notice of appeal to the Tenth District Court of Appeals. The Court of Appeals affirmed the decision of the trial court on June 28, 2005. The Supreme Court of Ohio subsequently refused to hear plaintiff's discretionary appeal.[2]

---

[2]Plaintiff filed her action in this court on December 15, 2004, just days after the hearing examiner issued his report. Plaintiff's case was stayed for a total of 30 months as a result of subsequent

{¶ 14} Plaintiff alleges that defendant published false and defamatory statements both in oral and written form which impugned her fitness as a nurse and mis-characterized her relationship with Williams.

{¶ 15} "Defamation is the unprivileged publication of a false and defamatory matter about another * * * which tends to cause injury to a person's reputation or exposes [him or her] to public hatred, contempt, ridicule, shame or disgrace or affects [such person] adversely in his trade or business." *McCartney v. Oblates of St. Francis deSales* (1992), 80 Ohio App.3d 345, 353. In general, slander refers to spoken words, while libel addresses words that are written, printed or found in other media.

{¶ 16} At trial, plaintiff identified a number of written and oral statements that she contends are both false and defamatory and that were published by OBN. Plaintiff also claims that a number of false allegations were made against her by employees of CareStar and ODJFS. For example, plaintiff claims that representatives of CareStar and ODJFS told plaintiff's client, Lucky Dukes, that she should fire plaintiff and that plaintiff was having a sexual relationship with Williams. OBN's potential liability for the allegedly false and defamatory statements of others will be discussed in connection with plaintiff's civil conspiracy claim.

{¶ 17} With regard to plaintiff's defamation action against OBN, the court notes that determining the truth or falsity of the written and oral statements at issue is complicated by the fact that information received by OBN during its investigation is confidential and not subject to discovery in any civil action. R.C. 4731.22(F)(5); see also *State Med. Bd. of Ohio v. Murray*, 66 Ohio St.3d 527, 535-536, 1993-Ohio-14; *Gipe v. State Med. Bd.*, Franklin App. No. 02AP-1315, 2003-Ohio-4061. Additionally, both plaintiff and Williams have testified that many of OBN's allegedly erroneous statements of fact regarding the cause of Lakisha's symptoms and the quality of plaintiff's nursing care arise from OBN's misunderstanding of Rhett's syndrome. However, as will be demonstrated below, the merits of plaintiff's claims can be addressed without the need

---

proceedings in Franklin County and during the pendency of other related actions filed by plaintiff in other courts.

for a determination of the truth or falsity of the alleged defamatory statements. Thus, falsity will be presumed for purposes of this decision, unless otherwise noted.[3]

{¶ 18} Plaintiff also claims that the hearing examiner falsely concluded in his Report that plaintiff caused Lakisha's death. Therein, the hearing officer states: "*During an investigation by the Board after Patient #1's death*, Board staff found cause to believe Ms. Johnson failed to timely implement a prescribed regimen for Patient #1, failed to make timely reports about Patient #1's condition, failed to consult as necessary with other nurses and other members of Patient #1's health care team, failed to make appropriate referrals on behalf of Patient #1, failed to maintain knowledge of the duties of nursing practice, failed to practice in accordance with applicable federal and state law, failed to demonstrate competence and accountability in the practice of nursing with respect to Patient #1, failed to completely, accurately and timely document nursing assessments or observations with respect to Patient #1, failed to implement measures to promote a safe environment for Patient # 1, and failed to delineate, establish and maintain professional boundaries with Patient #1." (Emphasis added.)

{¶ 19} There is no question that Lakisha was alive in 2003, during the pendency of the investigation. Thus, the statement that Lakisha was not alive at such time is false. However, contrary to plaintiff's assertion, the cited passage does not contain either a direct or circumstantial accusation that plaintiff caused Lakisha's death. Rather, the passage merely reflects the hearing officer's mistaken belief that the investigation occurred after Lakisha died. In the court's opinion, no reasonable recipient of the Report would infer that plaintiff caused Lakisha's death. See *McCartney*, supra, at 354. In short, the cited statement has no defamatory meaning. Id.

{¶ 20} Moreover, even if it were permissible to draw the inference suggested by plaintiff, OBN cannot be held liable to plaintiff in defamation due to the existence of an absolute privilege. In *Hardy v. Belmont Correctional Institution*, Ct. of Cl. No. 2004-09631, 2006-Ohio-623, affirmed, No. 06AP-116, 2006-Ohio-3316, the Tenth District Court of Appeals explained: "Statements made during judicial proceedings are afforded an absolute privilege when they are relevant to the issues at hand. The privilege applies even if the statement is untrue. The same policy considerations underlying the

---

[3]Inasmuch as all of the alleged defamatory statements at issue in this case were either directly or inferentially injurious to plaintiff's reputation in the nursing community, general damages shall also be

privilege relating to judicial proceedings also apply to quasi-judicial proceedings such as workers' compensation hearings before the Industrial Commission of Ohio. Id. (Internal citations omitted.); *Willitzer v. McCloud* (1983), 6 Ohio St.3d 447; *Pasanovic v. American General Finance, Inc.* (Sept. 17, 1992), Franklin App. No. 92AP-651 (concerning R.C. 4141.21 and information furnished to the Bureau of Employment Services); *Hecht v. Levin*, 66 Ohio St.3d 458, 1993-Ohio-110, (discussing statements made in the context of disciplinary proceeding before local bar association)."

**{¶ 21}** There is no question that the alleged defamatory statement made by the hearing examiner in his Report was relevant to the subject matter of OBN's administrative proceedings. Thus, applying the rule of absolute privilege, any statement of fact made by the hearing examiner, whether true or false, is absolutely privileged and not actionable. Similarly, absolute privilege shields OBN from liability to plaintiff for any statements made by Horst in her testimony before the hearing examiner and any such statements referenced in the Report. The privilege also attaches to any statements of fact attributed either to Horst or any other OBN employee in witness testimony.

**{¶ 22}** Plaintiff next contends that false and defamatory statements were published by OBN in both the January 16, 2004 Notice and the July 19, 2004 Notice. Although plaintiff acknowledges the truth of many of the facts set forth in such documents, she takes exception with nearly every statement that reflects negatively upon her nursing skills. However, there is no question that both the January 16, 2004 Notice and the July 19, 2004 Notice were authored and published by OBN in connection with the administrative proceedings pending against plaintiff. Indeed, OBN was required to publish such Notice in order to comply with law. See R.C. 4731.22(F). Therefore, any defamatory statements contained in either Notice are subject to an absolute privilege, even if the statements are untrue.

**{¶ 23}** Plaintiff next alleges that employees of OBN made false and defamatory statements to plaintiff's clients, employers, and prospective employers in an effort to damage her reputation in the nursing community and interfere with her employment opportunities.

**{¶ 24}** Williams testified that at some point during the pendency of the proceedings against plaintiff he asked his friend, John Kasper, to contact OBN by

---

presumed. See *Mallory v. Ohio University*, Franklin App. No. 01AP-278, 2001-Ohio-8762.

telephone and inquire of plaintiff's qualifications as a nurse. Kasper was told by Williams to pose as a prospective client seeking nursing care for his minor child. At trial, Kasper could not recall the date on which he made the call to OBN, the name of the person he spoke with, or the specific questions he asked. Nevertheless, Kasper stated that the unidentified OBN employee responded to his inquiry with words to the effect that "there was no problem, she was approved."

{¶ 25} According to Kasper, approximately one week after he made the call to OBN, he received a letter from OBN that he characterized as "very negative." Kasper recalled that the letter referred to plaintiff as "not recommended." Kasper could not remember the name of the OBN employee who signed the letter nor could he remember exactly what the letter said. Although Williams testified that he had seen the letter and that it contained the notation "not recommended," neither he nor Kasper could produce a copy of the letter at trial.

{¶ 26} Williams also claims that an unidentified employee of OBN told him that OBN could not work with him because of the pending proceedings against plaintiff and because of his "improper relationship" with plaintiff. Williams also claims to have personal knowledge of a similar statement made by another unidentified OBN employee either in response to his own inquiry about plaintiff or in response to an inquiry by State Representative Mike Mitchell, whom Williams had contacted regarding his daughter's care. On cross-examination, Williams testified that Mary Count accused him of having an improper relationship with plaintiff and stated that plaintiff was behaving as if she were Lakisha's "pseudo-parent." These statement were allegedly made by Count during the meeting at Children's Hospital in February 2003. Williams was admittedly unsure of Count's employment status but he believed that Count was an OBN employee. As noted above, Count is an employee of CareStar, not OBN.

{¶ 27} Plaintiff has also alleged that Horst called her a liar in a meeting with plaintiff's attorney. At trial, Horst denied making such a statement. In response to similar allegations by plaintiff, OBN Executive Director John Brion, R.N., M.S., denied ever telling any employer not to hire plaintiff or telling anyone that plaintiff had caused the death of a patient.

{¶ 28} Ferguson-Ramos testified that on or about April 2004, she forwarded a copy of the July 19, 2004 Notice to plaintiff's employer Good Nursing in response to a

telephone inquiry. Ferguson-Ramos recalled that an employee of Good Nursing had learned of the pending disciplinary proceedings against plaintiff by reading OBN's newsletter. According to Ferguson-Ramos, it was OBN's standard practice to publish such information in its newsletter and it was Ferguson-Ramos' standard practice to send a copy of the Notice to anyone making such an inquiry.

{¶ 29} Ferguson-Ramos also responded to an inquiry from Cambridge Nursing Home regarding the status of plaintiff's nursing license. Ferguson-Ramos testified that she informed the nursing home that plaintiff's license was "valid with disciplinary action pending."

{¶ 30} Based upon the totality of the evidence, the court finds that plaintiff has failed to prove that the alleged defamatory statements referred to by Williams were made by persons employed by OBN. Additionally, the court finds that the unidentified employee who allegedly referred to plaintiff's "improper relationship" with Williams intended to convey information about the boundary violations observed by Count and Horst. The evidence does not support a finding that the intended message was that plaintiff and Williams were involved in a sexual relationship.

{¶ 31} Additionally, plaintiff has not proven that any OBN employee told plaintiff's clients, employers or prospective employers not to hire plaintiff or to discontinue plaintiff's employment. Finally, the evidence establishes that the information Ferguson-Ramos communicated to Cambridge Nursing Home was truthful.

{¶ 32} Moreover, even if the court were to find that plaintiff had established a prima facie case of defamation with respect to all of the above-cited statements, OBN may invoke a conditional or qualified privilege. *A & B-Abell Elevator Co. v. Columbus/Central Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 7, 1995-Ohio-66, citing *Hahn v. Kotten* (1995), 43 Ohio St.2d 237 at 243. "The essential elements of a conditionally privileged communication may accordingly be enumerated as good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only." *Hahn*, at 246. The court must consider the circumstances under which they were made, in order to determine whether the defamatory statements are subject to a qualified privilege. *A & B-Abell*, supra, at 7. Furthermore, where the circumstances surrounding the publication

of the alleged defamatory publication are not in dispute, the determination of whether there is a qualified privilege is a question of law for the court. Id.

**{¶ 33}** Horst, Brion, and Ferguson-Ramos each testified credibly that they performed their duties in good faith. The evidence in this case, including the testimony of plaintiff and Williams, establishes that the information about plaintiff was communicated to others in response to specific inquiries about plaintiff and under circumstances that gave rise to a duty to respond. In short, the court finds that a qualified privilege attaches to the statements at issue.

**{¶ 34}** Once established, a qualified privilege may be defeated only if a claimant proves with convincing clarity that a publisher acted with actual malice. *Jacobs v. Frank* (1991), 60 Ohio St.3d 111, paragraph two of the syllabus. "Actual malice" is defined as acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity. Id. The phrase "reckless disregard" applies when a publisher of defamatory statements acts either with a high degree of awareness of their probable falsity or when the publisher in fact entertained serious doubts as to the truth of his publication. See *Perez v. Scripps-Howard Broadcasting Co.* (1988), 35 Ohio St.3d 215, 218. "[A]ctual malice in the context of a defamation action constitutes an "abuse of privilege." *A & B-Abell*, supra, at 11.

**{¶ 35}** Even though OBN employees were constrained by statute from fully disclosing the basis for their factual representations about plaintiff's nursing skill, her relationship with Williams, and her care of Lakisha, there is substantial evidence to support such representations. Plaintiff has offered nothing more than conclusory allegations that defendant's employees acted with knowledge that their statements were false or with reckless disregard as to their truth or falsity. Thus, plaintiff has failed to establish malice. See *Hardy*, supra, at ¶31.

**{¶ 36}** For the foregoing reasons, judgment shall be rendered in favor of defendant as to plaintiff's claim of defamation.

**{¶ 37}** Turning to plaintiff's claim of intentional infliction of emotional distress, the elements of that claim are as follows:

**{¶ 38}** (a) the actor either intended to cause emotional distress or knew or should have known that actions taken would result in emotional distress to the plaintiff;

{¶ 39} (b) the actor's conduct was extreme and outrageous, that it went beyond all possible bounds of decency and that it can be considered as utterly intolerable in a civilized community;

{¶ 40} (c) the actor's actions were the proximate cause of the plaintiff's psychic injury; and

{¶ 41} (d) the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it. *Pyle v. Pyle* (1983), 11 Ohio App.3d 31, 34.

{¶ 42} The Supreme Court of Ohio, in *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 374-375, borrowed from the Restatement of the Law of Torts, 2d § 46, comment (d) in describing what constitutes extreme and outrageous conduct:

{¶ 43} "'It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. * * * Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'"

{¶ 44} Even if the court were to conclude that some of the statements of fact published about plaintiff were false, and even if the court were to disagree with OBN's determination that plaintiff was not fit to practice nursing, the actions of OBN in this case were neither extreme nor outrageous. As noted above, OBN employees acted in good faith in connection with the investigation of Lakisha's care and in subsequent proceedings regarding plaintiff's license to practice nursing. Indeed, OBN had a statutory duty to act once it received information that a patient of one of ODJFS' clients had been admitted to an emergency care facility under circumstances where the patient's pre-admission care had been questioned. R.C. 4731.22(F).

{¶ 45} Absent proof of extreme and outrageous conduct on the part of OBN, plaintiff's claim for intentional infliction of emotional distress must fail.

{¶ 46} Plaintiff has also alleged that OBN conspired with employees of CareStar and others to make her a "scapegoat" for Lakisha's death by prosecuting false charges

in the process, defaming her. Civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent of one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 419, 1995-Ohio-61. (Additional citations omitted.) In the context of a civil conspiracy, common-law "malice" is that "'state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another.'" *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475, 1998-Ohio-294, quoting *Pickle v. Swinehart* (1960), 170 Ohio St. 441, 443.

{¶ 47} Neither Brion nor Ferguson-Ramos had met plaintiff prior to the OBN hearing, Brion was not involved in the OBN investigation. Additionally, the court has determined that each of the identified OBN employees, including Horst, discharged their duties in good faith. In short, the evidence does not demonstrate common-law malice. Thus, even if the conduct of OBN, CareStar, and others combined to produce an injury to plaintiff, such conduct does not give rise to an actionable claim of civil conspiracy.

{¶ 48} Finally, to the extent that plaintiff seeks a determination from this court that Horst, Brion, and Ferguson-Ramos acted outside the scope of their duties with OBN or with malicious purpose, in bad faith, or in a wanton or reckless manner, the evidence supports no such conclusion. Therefore, the court determines that Horst, Brion, and Ferguson-Ramos are entitled to immunity pursuant to R.C. 9.86 and 2743.02(F) and that the courts of common pleas do not have jurisdiction over any civil actions that may be filed against them based upon the allegations in this case.

{¶ 49} For the foregoing reasons, judgment shall be rendered for defendant.

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

DELORES JOHNSON

Plaintiff

v.

OHIO BOARD OF NURSING

      Defendant
      Case No. 2004-10876

Judge Alan C. Travis

<u>JUDGMENT ENTRY</u>

      This case was tried to the court on the issues of liability and civil immunity. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, the court finds that Bette Jo Horst, R.N., OBN Executive Director John Brion, R.N., M.S., and Lisa Ferguson-Ramos, R.N., J.D. are entitled to immunity pursuant to R.C. 9.86 and 2743.02(F) and the courts of common pleas do not have jurisdiction over any civil actions that may be filed against them based upon the allegations in this case.

      Judgment is rendered in favor of defendant. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

 

_____
ALAN C. TRAVIS
Judge

cc:

Peter E. DeMarco                Delores Johnson
Stephanie D. Pestello-Sharf     4493 Westerpool Circle
Assistant Attorneys General      Columbus, Ohio 43228
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

LP/cmd
Filed December 17, 2009
To S.C. reporter January 19, 2010