**IN RE: Karen Elaine BODDIE, Debtor.**

**Case No. 07–51645**

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

Dated: May 24, 2017

---

1. Creditor Trustee is defined in Article I of the Joint Plan at page 4.

## OPINION AND ORDER GRANTING TRUSTEE'S MOTION TO AP-PROVE SETTLEMENT BE-TWEEN THE TRUSTEE AND PNC BANK, N.A.

C. Kathryn Preston, United States Bankruptcy Judge

This cause came on for hearing on September 16, 2016 (the "Hearing"), upon the Motion to Approve Settlement between the Trustee and PNC Bank, N.A. (Doc. # 311) (the "Compromise Motion"), filed by the Chapter 13 Trustee, Frank M. Pees ("Trustee"), and the response thereto (Doc. # 313) (the "Response"), filed by

Karen Elaine Boddie ("Debtor"). Present at the hearing were Trustee, attorney Don Mains ("Mr. Mains") as counsel for Trustee, and Debtor, who appeared *pro se.*

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and General Order 05–02 entered by the United States District Court for the Southern District of Ohio, referring all bankruptcy matters to this Court. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

The Court, having considered the testimony of witnesses, exhibits admitted into evidence, and the documents of which it has taken judicial notice,[1] makes the following findings of fact and conclusions of law.

## I. Factual Background and Arguments of the Parties

### A. Procedural History

On March 12, 2007, Debtor filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code. In due course, Debtor's proposed Chapter 13 Plan was confirmed. Sometime after the filing of the Chapter 13 case, Debtor acquired additional assets, including a civil claim (the "PNC Claim") against PNC Bank ("PNC"). These additional assets are property of the bankruptcy estate. *See* 11 U.S.C. § 1306. Debtor did not initially disclose the PNC Claim by filing amended schedules[2]; she was under the impression she had properly disclosed the PNC Claim because she advised her counsel of its existence.[3]

In the latter half of 2011, Debtor engaged attorney Joseph S. Tann, Jr. ("Mr. Tann") to pursue the PNC Claim. At the time of the engagement, neither Debtor nor Mr. Tann filed an application with this Court seeking approval of his engagement and authorizing him to perform services on behalf of the Debtor or her bankruptcy estate. Mr. Tann (proceeding without court authority) ultimately prepared and filed a complaint against PNC.[4]

After Debtor completed the payments set forth in the Plan,[5] Debtor filed the Third Motion of Debtor Karen Elaine Boddie for a Determination under Section 1325(c) of [Title] 11 of the United States Code (Doc. # 133) (the "Determination Motion"). According to the Determination Motion, the District Court had directed

1. Pursuant to the Order Overruling Objections to Notice of the Court's Intent to Take Judicial Notice (Doc. # 347), the Court took judicial notice of the following documents (and the contents thereof) filed in the lawsuit styled as *Boddie v. PNC Bank, N.A.,* Case No. 2:12–cv–00158 (S.D. Ohio): (1) Amended Complaint for Damages with Jury Demand (Dist. Ct. ECF Doc. No. 15); (2) Stipulation of Partial Dismissal (Dist. Ct. ECF Doc. No. 22); (3) Opinion and Order [on PNC's Motion for Partial Judgment on the Pleadings] (Dist. Ct. ECF Doc. No. 85); and (4) Order [Striking Second Amended Complaint Except ¶ 28] (Dist. Ct. ECF Doc. No. 87).

2. Debtor finally filed an Amended Schedule B (Doc. # 115) on December 3, 2012, listing, among other things, the PNC Claim.

3. Debtor had counsel from the inception of her case until December 29, 2014, when she terminated her last counsel's employment. She has proceeded *pro se* since then.

4. Mr. Tann initiated the cause of action against PNC in state court. The matter was subsequently removed to the United States District Court for the Southern District of Ohio (the "District Court"), and assigned case number 2:12–CV–00158 (the "District Court Case").

5. In the Order Denying Chapter 13 Trustee's Motion to Convert Case (Doc. # 187), entered June 12, 2014, the Court ordered Debtor to remit an additional $800.00 to Trustee for administration and disbursement to creditors. It is unclear whether Debtor has made the payment.

Debtor to seek a determination from this Court whether any recovery from the PNC Claim must be paid into Debtor's plan for the benefit of creditors. In addition, Debtor sought a determination whether the PNC Claim, along with other post-petition assets, were property of the bankruptcy estate. After a hearing held on May 10, 2013, this Court ruled, *inter alia,* that the PNC Claim was property of Debtor's bankruptcy estate. *See* Order Granting Third Mot. of Debtor Karen Elaine Boddie for a Determination under Section 1325(c) of Chapter [*sic*] 11 of the United States Code and Directing United States Trustee to Review Case (Doc. # 138).

On May 27, 2013, Debtor filed a motion seeking authority to prosecute the PNC Claim on behalf of the estate (Doc. # 142), to which Trustee objected (Doc. # 152). After a hearing held on August 8, 2014, the Court denied Debtor's request and held that Trustee was the proper party to prosecute the PNC Claim. *See* Order Den. Debtor's Mot. for Authority to Proceed on Behalf of the Estate (Doc. # 207).

Subsequently, Debtor twice filed motions seeking approval of the employment of Mr. Tann as special counsel with respect to the PNC Claim. Objections were interposed by Trustee and the United States Trustee (the "UST"),[6] and both motions were denied after a hearing.[7]

## B. The PNC Claim and the Settlement

The PNC Claim resulted from Debtor's experience at a PNC branch located in or near Bexley, Ohio ("PNC Bexley"). On July 30, 2011, Debtor entered the PNC Bexley branch and requested transfer of $10,000.00 from her business account to her personal account, and sought to withdraw $6,000.00 in cash from her business account. Debtor had opened the PNC business account just three (3) days prior—on July 27, 2011—at a different PNC branch. At the time the business account was opened, Debtor deposited a check for approximately $54,000.00 from the Ohio Public Employee Retirement System (the "OPERS Check") into the account. PNC Bexley refused to honor Debtor's request to withdraw $6,000.00 in cash. According to Debtor, when she challenged PNC Bexley's refusal to honor the request, PNC Bexley summoned the police. Debtor was ultimately allowed to withdraw $1,000.00 in cash and transfer $15,000.00 to other accounts.[8]

Debtor alleges that PNC Bexley stated that it could not honor Debtor's request to withdraw $6,000.00 because it did not have sufficient funds on hand to honor it. Debtor—who is African–American—contends that this explanation was pretext, and that the refusal to honor her request, the use of such pretext, and the summons of the police department in response to her actions, were racially motivated and racially dis-

---

**6.** The UST only objected to Debtor's first motion seeking authority to employ Mr. Tann, filed September 27, 2013. The Chapter 13 Trustee filed objections to both motions.

**7.** Despite disapproval of his employment, Mr. Tann has filed several motions or applications in an attempt to procure compensation for services rendered with respect to the PNC Claim, all of which this Court has denied. In the Memorandum Opinion and Order On Motion to Lift Automatic Stay With Respect to Attorney Charging Lien (Doc. # 325), the

Court detailed the efforts by Debtor and Mr. Tann to obtain appointment of Mr. Tann as special counsel for the estate and secure compensation for services rendered by Mr. Tann. The Court finds no need to recite that history in this Opinion.

**8.** It appears that a small portion of the $15,000.00 transfer may have been transferred to an account other than Debtor's personal account. It is unclear exactly how much was transferred to Debtor's personal account, and how much was transferred elsewhere.

criminatory. Debtor claims that such discrimination has caused her to suffer emotional distress, that she has had to attend therapy as a result of the discrimination, and that she has been unable to work for five (5) years as a result of the discrimination.

Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, Trustee's Compromise Motion seeks authority to accept $50,000.00 in exchange for the full and final release of any and all claims against PNC (the "Settlement"). Trustee contends that the Settlement is reasonable in light of the circumstances of the case, and would result in a substantial increase in the dividend paid to general unsecured creditors. During his testimony at the Hearing, Trustee also expressed concerns regarding the feasibility of funding any continued litigation of the PNC Claim.

Debtor, however, urges the Court to reject Trustee's proposed settlement. In the Response, Debtor contends that Trustee (and his staff) do not have the necessary expertise to prosecute and/or negotiate settlement of the PNC Claim, that Trustee failed to avail himself of all relevant information prior to settling the matter, and that Trustee failed to involve Debtor in the settlement negotiations, which Debtor asserts was in contravention of this Court's order.[9] At the Hearing, Debtor reasserted her complaint about not being involved in the settlement process, and argued that the Settlement is unreasonably low given the amount of mental

anguish she has suffered (and continues to suffer) due to the alleged racial discrimination by PNC.[10]

## II. Analysis

 Rule 9019(a) of the Federal Rules of Bankruptcy Procedure provides, in pertinent part: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019. The rule offers no guidance on the criteria to be used in evaluating whether a compromise should be approved; however, the Sixth Circuit Court of Appeals has articulated a "fair and equitable" standard that must be applied by bankruptcy courts when reviewing a proposed compromise. *Waldschmidt v. Commerce Union Bank (In re Bauer)*, 859 F.2d 438, 441 (6th Cir. 1988) (citing *LaSalle Nat'l Bank v. Holland (In re American Reserve Corp.)*, 841 F.2d 159, 161 (7th Cir. 1987)).

 In determining whether a compromise is fair and equitable, bankruptcy courts should consider the following factors:

(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

9. At the hearing on Debtor's motion seeking authority to prosecute the PNC Claim on behalf of the estate (Doc. # 142), the Court denied the motion, but stated that it "urges the trustee to include [Debtor] in the conversations and make her aware of the status of [the settlement negotiations] from time to time[.]" Hr'g Tr. 26:6–8, August 8, 2014.

10. The Response also seeks denial of the Compromise Motion on the basis that the

motion was not properly served upon Debtor. However, it appears from the certificate of service attached to the Compromise Motion that Debtor was properly served with the motion by U.S. mail. Moreover, as Debtor did not argue that service of the Compromise Motion was insufficient at the Hearing, the Court will deem that argument abandoned.

*Fishell v. Soltow (In re Fishell)*, 47 F.3d 1168, 1995 WL 66622 at *3 (6th Cir. Feb 16, 1995) (quoting *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1381 (9th Cir. 1986)).

■ The responsibility of the bankruptcy court "is not to decide the numerous questions of law and fact raised by [the objecting party] but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness[.]' " *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (citing *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). A bankruptcy court must make an "informed and independent judgment as to whether a proposed compromise is fair and equitable." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). However, "[t]he [bankruptcy] judge ... is not to substitute her judgment for that of the trustee, and the trustee's judgment is to be accorded some deference." *Hicks, Muse & Co., Inc. v. Brandt (In re Healthco Int'l, Inc.)*, 136 F.3d 45, 50 n.5 (1st Cir. 1998) (quoting *Hill v. Burdick (In re Moorhead Corp.)*, 208 B.R. 87, 89 (1st Cir. B.A.P. 1997)) (brackets and ellipsis in original).

■ Moreover, "the Court must consider the principle that law favors compromise." *In re Goldstein*, 131 B.R. 367, 370 (Bankr. S.D. Ohio 1991) (citation omitted).

> [T]he very uncertainties of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise. This is a recognition of the policy of the law generally to encourage settlements. This could hardly be achieved if the test on hearing for approval meant establishing success or failure to a certainty.

*Fla. Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 571 (5th Cir. 1960). The party proposing the compromise bears the burden of persuading the bankruptcy court that the compromise should be approved. *Martin v. Kane (In re A & C Props.)*, 784 F.2d 1377, 1381 (9th Cir. 1986) (citing *Knowles v. Putterbaugh (In re Hallet)*, 33 B.R. 564, 565–66 (Bankr. D. Me. 1983)). Importantly, however, bankruptcy courts enjoy "significant discretion" when determining whether to approve or reject a proposed compromise. *Rankin v. Brian Lavan & Assocs., P.C. (In re Rankin)*, 438 Fed.Appx. 420, 426 (6th Cir. 2011); *see also In re Nicole Energy Serv.'s, Inc.*, 385 B.R. 201, 239 (Bankr. S.D. Ohio 2008).

**A. Probability of Success**

■ The first factor requires the Court to evaluate the probability of success were Trustee to continue to prosecute the PNC Claim on behalf of Debtor's bankruptcy estate.

> This step requires the court to estimate both the value of the proposed settlement and the likely outcome of litigating the claims proposed to be settled. The [c]ourt need not make a precise determination of the outcome, however, since an exact judicial determination of the values in issue would defeat the purpose of compromising the claim.

*In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 239 (Bankr. S.D. Ohio 2008) (internal quotation marks and citations omitted).

In the District Court Case, there are four (4) causes of action set forth in Debtor's Amended Complaint for Damages with Jury Demand (District Court Case, Doc. # 15) (the "Complaint") that remain pending against PNC: Denial of Statutory Right to Make and Enforce Contracts under 42 U.S.C. § 1981 (Count I); Violation of Uniform Commercial Code (Count III); Defamation (Count IV); and Interference

With or Destruction of Evidence (Count XI).

### i. Denial of Statutory Right to Make and Enforce Contracts under 42 U.S.C. § 1981 (Count I)

■■■■ "Section 1981 prohibits intentional race discrimination in the making and enforcing of contracts with both public and private actors." *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 867–68 (6th Cir. 2001) (citing 42 U.S.C. § 1981). To establish a *prima facie* case under 42 U.S.C. § 1981 for breach of contract by a commercial establishment, the plaintiff/customer must prove by preponderance of the evidence that:

(1) plaintiff is a member of a protected class;

(2) plaintiff sought to make or enforce a contract for services ordinarily provided by the defendant; and

(3) plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.

*Id.* at 872. Once a plaintiff establishes a *prima facie* case, the burden "shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 868. If the defendant carries that burden, then the plaintiff must prove "that the defendant's proffered reason is not its true reason but a pretext for discrimination." *Id.*

■■■■ A plaintiff that is successful on the merits of a discrimination claim under 42 U.S.C. § 1981 is entitled to recover compensatory damages, and may be entitled to recover punitive damages. *See, e.g., Bivins v. Wrap it Up, Inc.*, No. 07–80159–CIV, 2007 WL 3047122 (S.D. Fla. Oct. 18, 2007). Punitive damages, however, may only be awarded if the plaintiff shows "that the defendant acted with 'reckless or callous indifference to the federally protected rights' of the plaintiff, or that [the] defendant was 'motivated by evil motive or intent.'" *Beya v. Hoxworth Blood Ctr.*, 173 F.3d 428, 1999 WL 137625, at \*5 (6th Cir. 1999) (quoting *Beauford v. Sisters of Mercy–Province of Detroit, Inc.*, 816 F.2d 1104, 1108–09 (6th Cir. 1987)).

Review of the evidence submitted reveals that there are several significant hurdles to any substantial recovery on this claim. First—even assuming Trustee is able to prove a *prima facie* case—there are nondiscriminatory reasons for PNC Bexley's actions according to the statements of PNC Bexley's employees concerning the incident with Debtor.[11] According to a statement of Mary Ann Gagnon—the branch manager of PNC Bexley—when PNC Bexley conducted its due diligence with respect to Debtor's request, Ms. Gagnon saw that Debtor's business account was opened just three (3) days prior, and that the deposit of the OPERS Check had been flagged as a suspicious deposit. Ms. Gagnon's statement further asserts that Curtis Pope—the PNC employee who flagged the deposit—indicated that he had done so because the deposit was unusually large compared to Debtor's other transactions. However, in response to the flag on the deposit, there was a notation on Debtor's account indicating that the OPERS Check looked genuine and unaltered. Ms. Gagnon also contacted Mr. Pope by telephone. Mr. Pope told her that the check was "good" but to "follow

---

**11.** The statements of several of PNC Bexley's employees were admitted into evidence as Trustee's exhibits 14 through 17, and as Debtor's exhibit 1.

procedures." Mr. Pope advised Ms. Gagnon that his branch manager also suggested that she "follow procedures." Thus, PNC Bexley may have denied Debtor's request to withdraw $6,000.00 in cash because PNC Bexley was simply following procedures governing circumstances such as those presented, or because Ms. Gagnon believed that PNC's procedures required the denial of Debtor's request (even if they did not). Relying on the finder of fact to conclude that such reasons were a pretext for discrimination is a substantial risk to success in the litigation against PNC.

Debtor also claims that calling the police was discriminatory. Mr. Gagnon's statement indicates, however, that the police were called because Debtor was using profanity with PNC Bexley's employees and scaring customers. The statement of Kelli Trinoskey—the employee that placed the call to the police—states that she did so because Debtor was yelling and the situation continued to escalate. The statement of Matthew Morrison—another PNC Bexley employee—describes that Debtor remained in the bank after it had closed and refused to leave when asked to do so by PNC Bexley's employees. Even if Debtor remained relatively calm throughout the entire incident as Debtor contends, it seems that the fact that Debtor remained in the bank after closing and refused to leave would be reason enough to call the police. Thus, it appears that there may have been a legitimate nondiscriminatory reason for PNC Bexley to summon the police.

Assuming *arguendo* that Trustee can succeed in proving a case under 42 U.S.C. § 1981, there also appears to be significant impediments to obtaining a substantial award of damages. Debtor asserts that the incident has caused her to suffer emotional distress, that she has had to undergo therapy, and that she has been unable to work for five (5) years as a result of the discrimination. In her deposition,[12] Debtor identified symptoms of her emotional distress—crying spells, depression, trouble sleeping, and anxiety—but she testified that she did not know whether the incident at PNC Bexley caused the emotional distress that led to those symptoms. Boddie Dep. 211:13–212:22. Debtor further testified during her deposition that her father and sister had both passed away,[13] and she testified at the Hearing that she has bipolar disorder. A finder of fact could plausibly determine that Debtor's emotional distress was not caused by the incident at PNC Bexley, but is a result of other traumatic events and/or Debtor's existing mental condition.

In addition, other damages allegedly caused by PNC Bexley's failure to honor Debtor's request to withdraw $6,000.00 in cash appear to be limited: Debtor was unable to purchase an item of furniture at a clearance price, and she had to delay of the start of "some work" on her carriage house. Boddie Dep. 212:23–213:12. While these damages, if proven, would be recoverable by Trustee, it seems that the total amount of such damages could be far less than the amount of the Settlement.

Last, although a plaintiff may potentially recover punitive damages for violations of 42 U.S.C. § 1981, based on the facts highlighted to the Court, Trustee may have difficulty proving that PNC acted with "reckless or callous indifference to the federally protected rights" of Debtor, or that PNC was "motivated by evil motive or intent." *Beya*, 173 F.3d 428, 1999 WL 137625, at *5. Any recovery of punitive

**12.** Debtor's deposition was admitted into evidence, without objection, as Trustee's Exhibit 12.

**13.** Boddie Dep. 212:5–12.

damages on the § 1981 claim against PNC appears to be speculative.

### ii. Violation of the Uniform Commercial Code (Count III)

The next cause of action that is pending in the District Court Case is a claim for PNC's violation of Ohio Revised Code § 1304.31.[14] That section provides, in pertinent part:

> (A) Except as otherwise provided in sections 1304.01 to 1304.40 of the Revised Code, a payor bank wrongfully dishonors an item if it dishonors an item that is properly payable, but a bank may dishonor an item that would create an overdraft unless it has agreed to pay the overdraft.
>
> (B) A payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item. *Liability is limited to actual damages proved* and damages may include damages for an arrest or prosecution of the customer or other consequential damages. Whether any consequential damages are proximately caused by the wrongful dishonor is a question of fact to be determined in each case.

Ohio Rev. Code § 1304.31 (emphasis added). The term "item" is defined as "an instrument or a promise or order to pay money handled by a bank for collection or payment."[15] Ohio Rev. Code § 1304.01.

It is unclear whether Debtor actually presented an item to PNC Bexley, as that term is defined by Ohio statute. However, even assuming that Trustee can prove that Debtor presented an item and that PNC wrongfully dishonored the item, liability for the wrongful dishonor is limited to actual damages. As previously discussed, any actual or compensatory damages award to the estate could be far less than amount of the Settlement.

### iii. Defamation (Count IV)

■ Under Ohio law, the elements of defamation are "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Harris v. Bornhorst*, 513 F.3d 503, 522 (6th Cir. 2008) (quoting *Akron–Canton Waste Oil, Inc. v. Safety–Kleen Oil Serv., Inc.*, 81 Ohio App.3d 591, 611 N.E.2d 955, 962 (1992)). Oral statements that that do not require the showing of special damages are referred to as slander *per se* and encompass "words that import an indictable criminal offense involving moral turpitude or infamous punishment, impute some loathsome or contagious disease that excludes one from society[,] or tend to injure one in one's trade or occupation." *King v. Bogner*, 88 Ohio App.3d 564, 624 N.E.2d 364, 366 (1993) (citing *McCartney v. Oblates of St. Francis deSales*, 80 Ohio App.3d 345, 609 N.E.2d 216, 222 (1992)). In certain circumstances, however, a defendant may enjoy qualified immunity for statements made to police officers. *See Dehlendorf v. City of Gahanna, Ohio*, 786 F.Supp.2d 1358, 1364 (S.D. Ohio 2011). In addition, "[e]xpressions of opinion are protected under the Ohio Constitution and therefore cannot constitute defamation under state law." *Harris*, 513 F.3d at 522 (citing *Vail v. Plain Dealer Publ'g Co.*, 72

---

14. Ohio Revised Code § 1304.31 is Ohio's codified version of § 4–402 of the Uniform Commercial Code.

15. " 'Item' does not include a payment order governed by sections 1304.51 to 1304.85 of the Revised Code, a credit slip, or a debit card slip." Ohio Rev. Code § 1304.01.

Ohio St.3d 279, 649 N.E.2d 182, 185 (1995)).

The Complaint in the District Court Case alleges that Debtor was falsely accused of being involved in criminal activity. It is unclear from the record, however, what exactly was said, who made the allegedly defamatory accusation, and to whom the accusation was made. Even assuming that the allegedly slanderous statement(s) could be more precisely identified, the legal and factual complexities associated with proving the slander claim weigh in favor of approving the Settlement. First, it would have to be determined if the statements were merely an expression of an opinion of the person who made the statements, and thus protected under the Ohio Constitution. Moreover, if the statements which Debtor believes are defamatory were made to the police,[16] PNC may be entitled to qualified immunity regarding the statements.

If the defamation claim survived those hurdles, Trustee would then have to prove the *prima facie* elements of a defamation claim. Unless it could be proven that PNC Bexley engaged in slander *per se*, for which damages are presumed, Trustee would be required to show special damages. Nothing in the record suggests that Debtor was substantially damaged as a result of any slanderous statement allegedly made by PNC. The Court therefore cannot anticipate that litigation of this claim would yield a higher return to the estate than the Settlement.

### iv. Interference With or Destruction of Evidence (Count XI)

Under Ohio law, there is a common law cause of action in tort for the

spoliation of, interference with, or destruction of evidence. *See Smith v. Howard Johnson Co., Inc.*, 67 Ohio St.3d 28, 615 N.E.2d 1037, 1038 (1993).

> [T]he elements of a claim for interference with or destruction of evidence are (1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts[.]

*Id.* "In a spoliation case, the term 'willful' denotes both the intentional and wrongful commission of an act. Acts that are willful include those committed with premeditation, malice, or a bad purpose." *Maynard v. Jackson Cty. Ohio*, 706 F.Supp.2d 817, 829 (S.D. Ohio 2010) (citations omitted).

The claim for destruction of evidence in the instant matter is a result of PNC's alleged destruction of the surveillance video from July 30, 2011—the date of Debtor's incident at PNC Bexley. Mr. Tann testified that, within a few days of July 30, 2011, he alerted PNC's counsel that video from that day needed to be preserved, as it may be needed for future litigation. The video was never provided to Debtor or Mr. Tann by PNC, and PNC now contends that the video was overwritten in accordance with PNC policy.

Although the video clearly should have been preserved, there are several obstacles Trustee would have to overcome to prevail on this claim. Initially, Trustee would have to show that the destruction of

---

**16.** The Bexley Police Call Report for the incident between Debtor and PNC Bexley states that "the bank manager indicated that the account was fraud." Nothing in the record further clarifies what the bank manager actually said to the police, and/or whether the bank manager was simply relaying to the police what was reflected in PNC's system with respect to the deposit of the OPERS Check. It seems, however, that the claim for defamation could stem from whatever the bank manager told the police.

the video was willful. If the video was truly overwritten in accordance with PNC's policies, destruction of the video may have been a mere mistake, as opposed to an act "committed with premeditation, malice, or a bad purpose." *Maynard*, 706 F.Supp.2d at 829. Moreover, because PNC Bexley's surveillance system records video but not audio, it would be difficult to demonstrate that destruction of the video proximately caused damages to Trustee's case. It seems that, without audio, the video would be nearly useless in determining whether Debtor was the subject of discrimination by PNC Bexley. Thus, it appears that settlement of this cause of action is in the best interest of the estate.

### B. Difficulties of Collection

Trustee did not introduce any evidence regarding the difficulty of collection of any judgment the estate may receive were it to continue to prosecute the PNC Claim—likely because Trustee does not foresee any difficulty collecting any judgment from PNC. While it may be true that collectability of any judgment from PNC—a large financial institution—is a nonissue, the Court would be remiss if it did not acknowledge that PNC has the financial resources to sustain litigation over an extended period of time and may appeal any judgment obtained by Trustee. Thus, although there is little doubt that any judgment would ultimately be collectible, collection of the judgment could be delayed, if PNC elected to pursue its appellate rights.

### C. Complexities, Expense, Inconvenience, and Delay Associated with Litigation

The bankruptcy court must also evaluate the complexity of the District Court Case,

"including the expense, inconvenience and delay that the parties would face if the case were to proceed to trial." *In re Nicole Energy Serv's, Inc.*, 385 B.R. 201, 254 (Bankr. S.D. Ohio 2008). The discussion above illustrates that prosecution of the PNC Claim would involve complex evidentiary and legal issues; it naturally follows that prosecution of the PNC Claim would result in significant legal fees and expenses to the bankruptcy estate.

First and foremost is the complexity and expense associated with obtaining counsel to prosecute the PNC Claim. As it currently stands, Trustee has not engaged special counsel with respect to the PNC Claim, instead opting to have Mr. Mains—a staff attorney in Trustee's office—handle settlement negotiations. Mr. Mains and Trustee have not sought any additional compensation for the time Mr. Mains has expended with respect to the PNC Claim, and thus, the Settlement proceeds will not be taxed for payment of attorney fees. Trustee testified, however, that were the estate to continue prosecution of the PNC Claim, Trustee would be required to hire experienced litigation counsel, which—according to Trustee—may be difficult. Because Debtor has almost consummated her Chapter 13 Plan, there is no money currently flowing into the Chapter 13 estate,[17] and most of the money that was paid into the estate by Debtor has already been disbursed to creditors. The financial information regarding Debtor's Plan available on Trustee's website indicates that Trustee is holding only $5,016.00 out of the $115,520.67 that Debtor paid into the Chapter 13 Plan. Thus, the estate does not have the resources to pay an attorney on an hourly basis. Alternatively, Trustee would have to find an attorney willing to

---

**17.** Debtor has made all required payments to the estate except possibly the $800.00 payment required by the Order Denying Chapter 13 Trustee's Motion to Convert Case (Doc. # 187). *See* n.5, *supra*.

prosecute the PNC Claim—a claim which Trustee described in testimony as "sketchy"—on a contingency fee basis. Trustee also testified that Debtor has been difficult to work with, that she has been unresponsive, and that she has threatened to sue Trustee's counsel. Under these circumstances, it would not be surprising if Trustee had difficulty hiring experienced counsel.

Proof of damages also presents a challenge. Debtor asserts that much of her alleged damages are for, or resulted from, emotional distress that Debtor claims she suffered as a result of PNC's actions. As noted above, however, Debtor indicated in her deposition that she didn't know whether the incident at PNC Bexley caused her emotional distress. When asked about this at the Hearing, Debtor testified that she was not a doctor and could not say for certain what caused her emotional distress. Thus, it is evident that, if Trustee were to continue prosecution of the PNC Claim, expert testimony would be needed to prove the legitimacy and extent of Debtor's claimed emotional distress, and that PNC's actions caused Debtor's emotional distress. The expense of hiring experts, along with the other expenses inherent in litigation—including costs for transcribing depositions already taken, costs associated with taking additional depositions, fees for obtaining documents, and witness fees—may make it difficult or impossible for Trustee to continue litigation of the PNC Claim, given the estate's lack of financial resources. The Court finds that the complexities and expense of continuing litigation weigh in favor of approving the Settlement.

Moreover, continuing the litigation would cause more delay. Due to the peculiarities of the matters that arose in this Chapter 13 case, this case has been pending for over ten (10) years, which is substantially longer than the normal duration of Chapter 13 cases.[18] Trustee estimated that bringing the litigation to trial would require two (2) to three (3) more years, and any judgment favorable to Trustee may then be appealed. Approval of the Settlement will allow payment to creditors now rather than two (2) or three (3) years hence, while avoiding the risk of an adverse outcome.

### D. Interests of Creditors

In considering the final factor, the Court finds that the Settlement meets the paramount interests of creditors. First, approval of the Settlement would result in a significant increase in the dividend paid to unsecured creditors—from thirteen percent (13%) to approximately seventy percent (70%). Second, the Court notes that all creditors of Debtor's bankruptcy estate were served with the Compromise Motion, and not a single creditor objected. Third, as noted above, this case has been pending for over ten (10) years. As the PNC Claim is the only asset of Debtor's bankruptcy estate left to be administered by Trustee, settlement of the PNC Claim will allow for prompt final administration of the bankruptcy estate, payment to creditors, and issuance of Debtor's discharge.

---

18. With the enactment of the Bankruptcy Reform Act of 1978, Congress intentionally prohibited Chapter 13 plans from providing for payments over a period that is longer than five (5) years. *See* 11 U.S.C. § 1322(d). That ended "what it termed 'the closest thing there is to indentured servitude,' where some debtors are put 'under court supervised repayment plans for seven to ten years.' " *Pierrotti v. United States IRS (In re Pierrotti)*, 645 F.3d 277, 281 (5th Cir. 2011) (quoting H.R. Rep. No. 95–595, at 117 (1977), *reprinted in* 1978 U.S.C.A.N.N. 5963, 6078). Typically, Chapter 13 cases are fully administered and the debtor's discharge is entered shortly after completion of the debtor's plan payments.

### III. Conclusion

The Court finds that there is significant risk to proceeding to litigation with respect each of the causes of action remaining in the District Court Case, and that, even if Trustee were successful in proving the elements of one or more causes of action, there is substantial uncertainty as to whether any damages award would result in a higher net distribution to the estate than the proposed Settlement. Debtor is correct in her assertion that Trustee and his counsel do not have expertise in handling matters such as the PNC Claim; however, Trustee introduced a wealth of exhibits—all of which were admitted without objection—that allowed the Court to assess the strengths and weaknesses of the estate's causes of action. In contrast, Debtor did not introduce any evidence— documentary or otherwise—which suggested to the Court that continuing litigation may result in a higher net recovery for the estate or is otherwise in the best interest of the estate.

For the foregoing reasons, the Court finds that the Settlement is fair and equitable and should be approved. Therefore, it is

**ORDERED** that the Motion to Approve Settlement between the Trustee and PNC Bank, N.A. (Doc. #311) is hereby GRANTED; it is further

**ORDERED** that Trustee is authorized to accept $50,000.00 in exchange for the full and final release of any and all claims against PNC.

**IT IS SO ORDERED.**